360 A.2d 871.

NASCO, INC. *et al. vs.* DIRECTOR OF PUBLIC WORKS
FOR STATE OF RHODE ISLAND.

JULY 28, 1976.

PRESENT: Bevilacqua, C.J., Paolino, Joslin, Kelleher and Doris, JJ.

KELLEHER, J. A headline in the April 27, 1967, edition of The Woonsocket Call proclaimed: "State To Build Road Bypassing Main Street." The story told the reader that the "* * * bypass road would be constructed through the reclaimed pond area from Bernon Street to Clinton Street" and that there would be some condemnation of land. Today a motorist approaching the downtown section of the city of Woonsocket can observe roadside signs that point the way to the "Main Street Bypass."

The bypass, a traffic engineering marvel, is a modern divided highway providing two lanes for both north- and south-bound traffic. Entry onto the northbound portion of the bypass is made via Bernon Street on the south. South-bound traffic enters the bypass from Clinton Street on the north.

The state filed the necessary condemnation plats to acquire certain properties located where the proposed bypass

would be constructed. This litigation involves three of these properties, two of which are identified as parcels 10 and 12 on plat 1616, which was recorded in the Woonsocket land evidence records during October 1968. The third property is identified as parcel 1 on plat 1626, which was recorded in late April 1969.

Subsequent to the filing of the condemnation plats, the three petitions presently under review were filed in the Superior Court. Nasco's petition embraces all three parcels. The petitions filed respectively by the city of Woonsocket and the Rogers family relate only to parcel 10. It has been stipulated that petitioners hold the following fee-simple interests in and to parcel 10: Nasco — 15/32; city of Woonsocket — 9/32; the Rogers family — 8/32.

The petitions were consolidated for a Superior Court jury-waived trial, which encompassed a period of 6 days. Following the conclusion of the testimony and arguments, the trial justice in a bench decision found for petitioners in the amount of $292,554, which was the exact appraisal given by their real estate expert. The state has appealed. As we turn to the merits of the appeal, we shall, for reasons of convenience, assume that only Nasco is before us.

Parcel 10 is a ribbon of land that measures 109,353 square feet in area. The parcel is actually part of the dried-up bed of a body of water known as Clinton Pond. Years ago Clinton Pond played an important role in serving the water-power needs of the many textile mills located in the Woonsocket area. When the city's textile industry dried up, so did the pond. The parcel begins at a point about 300 feet northeast of Bernon Street and meanders in a somewhat northeasterly direction. It winds between various properties fronting Main Street and real estate abutting Allen Street at one point and the Blackstone River at another. The parcel's elevation varies from being level with Main Street at one point and "as much

as 40 feet" below Main Street at another. The parcel runs under the Court Street Bridge and terminates at the southerly edge of a trestle supporting the tracks of the Providence and Worcester Railroad Company. According to Nasco's expert, this ribbon of land has an average width of about 68 feet. At the extreme northeasterly end of the ribbon was a portion of a parking lot that was owned and operated by the city of Woonsocket. Entrance to the parking lot was by way of Main Street. The lot was a considerable distance below the grade of that thoroughfare.

Parcel 12 begins at the northerly edge of the railroad track trestle. Essentially, it is a ribbon-shaped continuation of parcel 10, having a northern terminus at the intersection of Clinton and Worral Streets. This particular piece of real estate measures 45,432 square feet in area.

Parcel 1 is a somewhat triangular-shaped piece of real estate with one of its sides situated in the waters of the Blackstone River. The total area of the parcel amounts to 89,865 square feet. More than a third of this footage is under water.

Before condemnation, parcels 12 and 1 served as the site of a large complex of separate but interconnected buildings, which the Woonsocket populace referred to as the Clinton Mill. Nasco purchased the mill property in 1957 for $65,000. Several of these buildings were included within the October 1968 taking of parcel 12, and the state completed its sweep of the remaining structures by its April 1969 taking. The buildings, containing a total floor space area of 134,400 square feet at the time of the takings, were for the most part abandoned and in a state of disrepair. The main building was built in 1849.

During the morning of March 25, 1968, some 7 months before the first taking, virtually all of Woonsocket's firefighters were battling a spectacular fire that originated

in a rear ell of the mill. Interestingly enough, one of the spectators who stood on Clinton Street watching the fire and the firefighters was the real estate expert who testified for the director at the September 1974 trial.

The director's appeal raises eight points, which can be reduced to an evaluation of two judicial acts: (1) the trial justice's in toto acceptance of the testimony offered by Nasco's real estate expert; and (2) the court's allowance of testimony detailing past uses of the mill buildings and describing the precondemnation rumors, allegedly common knowledge in Woonsocket, that some governmental agency was about to acquire the Clinton Mill property as a site for a public purpose structure.

The Superior Court trial, for all intents and purposes, evolved into a joust between the two real estate experts. Nasco's expert had been in the business of selling and appraising real estate for over 40 years. He had concentrated his efforts in the northern Rhode Island area, particularly Woonsocket. As part of his in-court testimony he furnished the trial justice with a 1957 auctioneer's brochure which was circulated in conjunction with the sale of the Clinton Mill complex. The brochure, introduced into evidence, contains pictures and a sketch which are most informative. The witness also presented a publication issued by the Rhode Island Statewide Comprehensive Transportation and Land Use Planning Program which is dated September 1967 and entitled "Preliminary Route Location Study — Downtown Traffic Relief Route, Woonsocket, Rhode Island." This document, introduced as an exhibit, contains an array of sketches, statistics, and proposals to alleviate traffic congestion in downtown Woonsocket. One of its exhibits has an aerial view of the downtown area upon which is superimposed an artist's conception of what today is the "Main Street Bypass."

The director's expert reported that he was in the business of "real estate appraisal, consultation, and brokerage." A 30-year veteran in the business, his qualifications and experiences are spread over four full pages of the transscript. He presented a number of photographs of the area and the buildings involved in this litigation.

The director argues with great vigor that the trial justice was clearly wrong in accepting the appraisals presented by Nasco's expert and rejecting those submitted by his expert. It is appropriate that we highlight some aspects of the experts' testimony.

Nasco's expert, by using the comparable sales method of appraisal, established a value for parcel 10 of $1.05 a square foot. He also applied this valuation to the land in parcel 12 and the land portion of parcel 1 above water. With respect to the submerged footage of parcel 1, he assigned it a value of 10 cents a square foot. Combining the total worth of each parcel based on these per square foot values, his total assessment of the land involved in both takings was $232,224. Moreover, the complex of buildings, according to his testimony, contained 134,400 square feet of floor space, which he valued at 30 cents a square foot or $40,320 in the aggregate. Finally, he testified that severance damages in the amount of $20,000 resulted from the taking of parcel 10. The sum total of the land appraisals, the value of the mill structures, and the severance damages was $292,544.

In his testimony Nasco's expert opined that the highest and best use for parcel 10 would be an automobile parking lot, comparing the parcel's potential with a nearby privately owned parking facility located alongside the former railroad depot. He refused, however, to characterize parcel 10 as landlocked, noting that the pond bed was accessible via Allen Street. Although he conceded that Allen Street was a dead-end roadway, he informed the

court that he had driven his car over land at the end of the street and along the bed of the pond. With regard to Nasco's other property, the expert described the mill buildings as being in a state of "deferred maintenance," which could be "prettied up." He remarked that the highest and best use for the mill property would be either a manufacturing facility or a retail store, noting two nearby discount stores situated in converted textile mills.

The director's expert agreed with several observations made by Nasco's expert. He, too, thought the highest and best use of parcel 10 would be an automobile parking lot, that the underwater portion of parcel 1 was worth 10 cents a square foot, and that both parcels 12 and 1 could be developed for commercial purposes. However, this expert thought that the mill complex was beyond repair, should be demolished, and, therefore, had no value. Using the comparable sales approach, he assigned a value of $1.20 per square foot to the parcel 12 land because of its frontage on Clinton Street. He assigned a value of $1.10 per square foot to the dry footage of parcel 1. Parcel 10, in his opinion, was landlocked rear property with precipitous grade problems, which deserved a valuation of 50 cents a square foot. The director's expert made various other adjustments relating to the cost of demolishing the mill buildings and the loss of nearly 20,000 square feet of pavement that had covered the city of Woonsocket's parking lot. He insisted that there were no severance damages incident to the taking of parcel 10. Combining his computations, the total loss suffered by Nasco, in his opinion, amounted to $166,000.

In singing the praises of his expert, the director points to the scientific methods of his appraisal which resulted in a comparative evaluation of the various parcels: the highest value accorded the land fronting Clinton Street, a somewhat lower value to the remainder of the mill real

estate, and the lowest appraisal for the landlocked, below-grade pond bed. Unfortunately, the director overlooks one crucial factor that guides any trial justice in making a choice between testimony presented by two experts whose views on the matters in issue do not coincide — credibility. In *Kyle* v. *Pawtucket Redev. Agency,* 106 R. I. 670, 673, 262 A.2d 636, 637-38 (1970), we observed that ordinarily an expert's testimony does not enjoy a preferred status, and this applies whether he appears in a negligence case or a condemnation case. We said in *Kyle* that it is the obligation of the trier of fact to examine and consider the testimony of every witness regardless of his qualifications and to accord that testimony only such weight as the evidence, considered as a whole, and the inferences drawn therefrom reasonably warrant.

The director's expert, who described himself as a man gifted with a photographic memory, gave a vivid description of the precondemnation fire. Following the first taking he made an onsite inspection of the mill complex. When asked what he saw, he replied: "I found a large industrial mill complex that was reduced to rubble and gutted as a result of fires over a period of years." Later, in cross-examination, the expert denied that he had said that the buildings had been reduced to rubble. However, when his earlier testimony was read back to him, he explained that he had used the term "rubble" to mean economic rubble.

While the director's expert presented a variety of photographs depicting the exterior of the mill buildings, none of the photographs showed any of the damage to the interior of the premises. Cross-examination disclosed that the director's expert had failed to observe the elevators that service the five floors of the mill's main building and somehow was uncertain as to the type of sprinkler system that protected one of the complex's buildings. These

720

omissions, including the absence of any photographic evidence of the damaged interior, plus the expert's use of imprecise rhetoric, played an important part in the trial justice's choice of which expert she was going to believe.

After commenting on the choice of language used by the director's expert, the trial justice went on to describe the analysis and the opinions of Nasco's expert as "extremely persuasive." She saw fit to accept this expert's testimony and reject that offered in behalf of the director. Such a choice is a prerogative of the factfinder, and we can see no reason to fault her choice. *Parillo* v. *Director of Pub. Works,* 112 R. I. 427, 435, 312 A.2d 198, 203 (1973); *Cunningham* v. *Marcello,* 106 R. I. 400, 404, 260 A.2d 451, 453 (1970).

While we cannot fault her rejection of the opinions offered by the director's expert, we must fault her acceptance of the testimony of Nasco's expert as it concerned the value of the mill buildings and the presence of severance damages. It is not clear from this expert's testimony whether the 134,400 square feet of floor space to which he referred included all of the buildings or just that area that was included in the pre-Civil War structures. As noted before, the mill complex was made up of a number of buildings. The main building, a monolithic granite structure, was built in 1849. Some of the other mill buildings are unquestionably of more recent vintage. This portion of his testimony was purely a series of conclusions lacking the requisite factual basis to support them.

When the expert first stated the 30-cents-a-square-foot figure, counsel for the director objected to his use of the reproduction cost less depreciation approach. Nasco's counsel, in response, told the court that the director's concern was unwarranted because the sole purpose of this type of testimony was to permit the expert to discuss the three methods of real estate appraisal. Nevertheless, later

in his testimony the expert employed the 30-cent figure to compute the value of the floor space in the complex. When he was pressed during cross-examination on how he arrived at the figure, he described the figure as a product of his "own brain computer," conceding that his conclusion might be resting upon his experience. We see no reason why the assessments based on his "experience" are entitled to any more weight than the "experience" of the real estate experts who testified in either *Kargman* v. *Jacobs*, 113 R. I. 696, 703, 325 A.2d 543, 547 (1974), or *L'Etoile* v. *Director of Pub. Works*, 89 R. I. 394, 402, 153 A.2d 173, 178 (1959). In both instances we ruled that an expert's opinion based solely on the witness' "experience" in evaluating property, without detailing any specific reasons or factors, was entitled to no weight. An expert may not give an opinion without describing the foundation on which his opinion rests. If the expert wished to establish the value of the buildings, he might have presented the court with a report of the sales of comparable properties and a breakdown depicting how much of the purchase price was allocated to the land and how much to the buildings.

The assessment given by Nasco's expert as to the value of the buildings is worthless. In making this observation we would emphasize that a property owner is certainly entitled to receive "just compensation" for property which is taken from him by eminent domain. Nevertheless, when there is a dispute over the reasonableness of the offer made by the condemning authority and judicial relief is sought, the litigant should receive just compensation but not a penny more. By bringing its petition, Nasco assumed the burden of proving what was the fair value of its buildings at the time of taking, and it failed to discharge this burden.

Again, during his testimony Nasco's expert described the "severance damages" suffered by the remainder of the pond bed that now abuts the bypass. When asked what was the amount of this damage, he replied, "$20,000." The expert told the trial justice that he was not a lawyer and "[f]rom a legal standpoint I don't know whether this bypass is a limited access, or whether it's locked in, like the highways." The trial justice, in awarding $20,000 severance damages, specifically relied upon the mandate that was originally laid down in *Sullivan* v. *Marcello,* 100 R. I. 241, 214 A.2d 181 (1965), and repeated by us again in *Honig* v. *Director of Pub. Works,* 106 R. I. 199, 258 A.2d 73 (1969), and *Murphy* v. *Director of Pub. Works,* 103 R. I. 451, 238 A.2d 621 (1968).

In all three of those cases the state, through its Director of Public Works, was acquiring property as part of its engineering efforts to either change a conventional highway into a freeway or interconnect two freeways. Sullivan's and Murphy's real estate abutted on George M. Cohan Boulevard at a time when that roadway was being converted into a limited access highway and the condemnation instruments that were involved were unclear as to what provision, if any, had been made to protect Sullivan's and Murphy's rights to have reasonable access to the highway that ran by their real estate. This was also true of the Honig real estate, which was affected by the state's extending the Huntington Avenue freeway to Route 95 of the interstate highway system. The *Sullivan* trilogy stands for the proposition that condemnation instruments involving the installation of limited access highways should be specific as to the condemnor's commitment to safeguard the abutter's right to have reasonable access to the roadway that passes his property, and if the documents are dubious in this regard, they will be construed as completely destroying the owner's access rights without re-

gard to the condemnor's good faith proposals to afford adequate sources of substitute access.

The *Sullivan* rule has no application whatever to the parcel 10 taking. The condemnation plat and the statement of taking make it absolutely clear that the "Main Street Bypass" is to be a state highway and not a freeway. As noted in the *Honig* case, the landowner who abuts a state highway continues to enjoy his right of reasonable access, whereas the same is not true when the highway that passes his property is a freeway. *Honig* v. *Director of Pub. Works, supra* at 205-06, 258 A.2d at 77. There is not a freeway line on either of the condemnation plats, because the entire Woonsocket project deals with highways, not freeways. In fact, the plat[1] contains a specific notation whereby the director expressly states that the abutters will have access to the bypass.

Apart from the *Sullivan* rule, we note that even if severance damages were to be awarded without reference to access rights, petitioners' expert made no effort to value the entire pond bed, giving value to that portion taken and then giving value to that portion which remained. In fact, he conceded that all he did was appraise that part of the bed that appears on the plat as parcel 10. Consequently, the trial justice erred in awarding severance damages.

The final facet of the director's appeal needs little comment. There are two brothers who, for all intents and purposes, controlled Nasco. One of the brothers gave the trial justice a complete history of Nasco's ownership of the mill property. He told of the pre-1968 difficulties in leasing the property because prospective tenants would report to him that they had heard that either the federal, state, or municipal authorities were going to acquire the

---

[1]See Appendix.

mill complex by way of condemnation and erect on that location such facilities as either a library, or a federal office building, or a civic center, or a bypass highway. According to this witness, any desire by a prospective tenant to lease the property quickly dissipated after reading about the various proposals that centered on the acquisition of the Clinton Mill property. This witness presented a collection of newspaper reports which gave credibility to his testimony.

Assuming that the reception of this type of testimony was erroneous, it is obvious that such an error was harmless because the trial justice in her written opinion made it clear that her decision was based solely on the presentation made by Nasco's expert and not by any of the testimony presented by the official of Nasco.

Accordingly, in each cause the director's appeal is sustained in part and denied in part, so much of the judgment that represents either an award for the building or a grant of severance damages is vacated and the remainder of the judgment is affirmed, and the cause is remanded to the Superior Court for further proceedings.

*Leonard Decof*, for Nasco, Inc., *Aram P. Jarrett, Jr.*, for City of Woonsocket.

*Stephen F. Mullen*, for Director of Public Works.

APPENDIX

NOTE: This diagram is not to scale. It is merely for the assistance of those reading this opinion. It does not portray the buildings that were located on parcels 1 and 12.