CAPITAL PROPERTIES, INC.

v.

STATE of Rhode Island.

No. 92–273–Appeal.

Supreme Court of Rhode Island.

Jan. 24, 1994.

**320**

Gerald J. Petros, Hinckley, Allen, Snyder & Comen, Providence, for plaintiff.

Daniel A. Procaccini, Charles J. McGovern, McGovern, Noel & Benik, Inc., Providence, for defendant.

## OPINION

LEDERBERG, Justice.

This matter came before the Supreme Court on the appeal of Capital Properties, Inc., from a judgment of the Superior Court sitting without a jury. Capital Properties, Inc. (CPI), had petitioned the Superior Court for an assessment of damages following the condemnation of its land by the State of Rhode Island (state) in the course of implementing the Capital Center Project. The primary issue on appeal is whether the trial justice erred in valuing CPI's property. For the reasons stated herein, we find that the trial court misapplied the law in determining the value of CPI's property. Therefore, we sustain CPI's appeal and remand this matter for a new trial. A summary of the pertinent facts and travel of this case follows.

## I

### *Background*

During the 1970s, various public and private groups conceived a plan for the revitalization of thirty acres of land stretching from the old Union Station to the State House in downtown Providence, Rhode Island; the area included railroad yards and tracks, municipal parking lots, and the Woonasquatucket and Moshassuck Rivers. The land, although adjacent to the downtown area, remained cut off by the railroad station, by the tracks, and by tunnels under the tracks. Eventually, the state, the city of Providence (city), and the federal government began to discuss the possibility of relocating the tracks. In the late 1970s the federal government decided to upgrade railways in the northeast corridor, including those running through Providence. Realizing the opportunity, the state, the city, and the Providence & Worcester Railroad Company, which owned large parcels of land in the area,[1] together convinced the federal government to relocate the tracks.

The General Assembly contributed to the effort by passing An Act Relating to Special Development Districts, P.L.1981, ch. 332, § 1 (codified at G.L.1956 (1991 Reenactment)

---

**1.** In the late 1970s, Providence & Worcester Railroad Company began to segregate its properties that were excess to its railroad operations but available for commercial development. Those properties were transferred to a wholly owned subsidiary, the Providence & Worcester Realty Company (P & W). The P & W eventually transferred the properties to another wholly owned subsidiary—Red Bridge Terminal Company that, in turn, was merged into Capital Properties, Inc., the current owner.

chapter 24.4 of title 45). The act provided for "the appropriate, comprehensive, and coordinated development of railroad or former railroad properties and adjacent lands that are or may be the subject of railroad relocation projects involving federal, state, local, and private action" by permitting "the creation of special development districts" together with "special development district commissions" empowered to adopt, to implement, and to administer plans of development of such districts. Section 45–24.4–1(d). Finally, on January 27, 1982, the state, the city, the Providence & Worcester Realty Company (P & W), the National Railroad Passenger Corporation (Amtrak), the Federal Railroad Administration, and the Providence Redevelopment Agency signed a cooperative agreement for relocation of the railroad tracks, thereby ensuring the essential prerequisite for development of the thirty-acre tract. Subsequently, the Providence City Council, pursuant to § 45–24.4–4, established the Capital Center Development District (Capital Center District) and created the Capital Center Commission to coordinate the development of the district. Providence, R.I., Ordinance ch.1982–54, No. 493 (Sept. 10, 1982).

Under the 1982 Cooperative Agreement, P & W donated most of the land for the railroad-track relocation and additional land for construction of public improvements in the Capital Center District, along with cash in the amount of $3.8 million. Within the Capital Center District, P & W retained three parcels of land, designated as parcels 2, 3, and 4; P & W eventually became a wholly owned subsidiary of CPI, which, in turn, assumed ownership of parcels 2, 3, and 4.

In 1982, CPI took steps to develop one of the parcels, but its plans were halted as the state discussed the relocation of the Woonasquatucket and Moshassuck Rivers. The state committed to the river relocation in 1984, but the project called for condemnation of portions of CPI's Capital Center District property.

Accordingly, on November 13, 1987, the state took by condemnation portions of each of parcels 2, 3, and 4. The state determined that the fair-market value of the land taken,

93,345 square feet, was $2,599,051 on the date of condemnation and tendered that amount to CPI. Because it disagreed with the valuation, CPI, on April 6, 1988, timely petitioned the Superior Court for assessment of damages. The case was reached for trial on December 2, 1991. The nonjury trial concluded on December 12, 1991, and on February 10, 1992, judgment was entered for CPI in the amount of $400,950 plus interest. In response, CPI, claiming compensation in the amount of $6.1 million, filed the instant appeal on February 19, 1992. We next address the issues presented on appeal.

## II

### Valuation

■ Article I, section 16, of the Rhode Island Constitution provides, in pertinent part, that "[p]rivate property shall not be taken for public uses, without just compensation." Accordingly, this court in land-condemnation cases must assure that the landowner receives fair and just compensation. *Warwick Musical Theatre, Inc. v. State,* 525 A.2d 905, 910 (R.I.1987); *J.W.A. Realty, Inc. v. City of Cranston,* 121 R.I. 374, 381, 399 A.2d 479, 483 (1979). "Nevertheless, when there is a dispute over the reasonableness of the offer made by the condemning authority and judicial relief is sought, the litigant should receive just compensation but not a penny more." *Nasco, Inc. v. Director of Public Works,* 116 R.I. 712, 721, 360 A.2d 871, 876 (1976). Just compensation includes the fair-market value of the land taken at the time of the taking. *Ocean Road Partners v. State,* 612 A.2d 1107, 1110 (R.I.1992).

■ The preferred method of ascertaining the fair-market value of land taken by condemnation is the comparable-sales method. *Warwick Musical Theatre, Inc.,* 525 A.2d at 910. Accordingly, evidence of comparable sales, when available, will generally serve to exclude the use of other methods of deducing fair-market value. *Corrado v. Providence Redevelopment Agency,* 117 R.I. 647, 653, 370 A.2d 226, 230 (1977). To avoid injustices to owners of condemned land, however, departure from this general rule is allowed in certain situations. *J.W.A. Realty,*

*Inc.,* 121 R.I. at 381, 399 A.2d at 483. A trial justice may depart from the comparable-sales method "when he finds that the subject property is unique or special purpose." *Warwick Musical Theatre, Inc.,* 525 A.2d at 910; *accord Woodmansee v. State,* 609 A.2d 952, 955 (R.I.1992).

At trial one of the state's real estate experts, Norman R. Benedict (Benedict), compared five comparable sales involving four properties (one of which was resold) to parcels 2, 3, and 4. The four comparable properties were located at (1) 220 India Street, (2) 71 West Exchange Street, (3) 121 West Exchange Street, and (4) 65 Cedar Street in Providence, Rhode Island. Benedict's testimony indicated that the respective per-square-foot sales prices were (1) $48.60, (2) $104.16, resold for $110.82, (3) $72.20, and (4) $73.92. Employing the "before-and-after" approach, Benedict used the comparable sales to deduce the "before-condemnation" and the "after-condemnation" values of parcels 2, 3, and 4. His before values were $5.5 million, $3.9 million, and $10.3 million, respectively, for a total before-condemnation fair-market value of $19.7 million. He assigned after values of $6.0 million, $5.9 million, and $4.8 million, to parcels 2, 3, and 4, respectively, for a total after-condemnation fair-market value of $16.7 million. Benedict's testimony indicated that the after-condemnation value of the remaining land was inflated by his consideration of "special benefits" produced by the condemnation itself; he valued the special benefits at $1.2 million.

The trial justice reasoned that CPI's land was unique and special purpose because the Capital Center Project raised the land's value to the point where it became "value damage proof." Therefore, he rejected a strict comparable-sales analysis, accepted Benedict's before-and-after method of valuation, and concluded that the $3.0 million difference between the before-and-after values represented the November 13, 1987 fair-market value of the condemned land. As CPI contends, this sum translates into approximately $34 per-square-foot, compared to the $48.60, $104.16, $110.82, $72.20, and $73.92 per-square-foot valuations of Benedict's five comparable sales. Because the state had already

paid $2,599,051 at the time of condemnation, the trial justice subtracted that amount from Benedict's $3.0 million valuation and awarded CPI $400,950 plus interest.

The critical inquiry is whether, because data from comparable sales were available, the trial justice correctly concluded that CPI's land is special-purpose property so that valuation other than by the comparable-sales method would have been justified.

■ Property generally is considered special purpose where it is useful to its owner but has no definite and ascertainable market value because such property is not regularly bought and sold on the open market. *Assembly of God Church v. Vallone,* 89 R.I. 1, 10, 150 A.2d 11, 15 (1959); *cf. Corrado,* 117 R.I. at 658 n. 4, 370 A.2d at 232 n. 4 ("subject property, while unique, has a definite and ascertainable market value and is not a so-called 'specialty property'"). Examples of real property that this court has found to be special purpose for eminent-domain purposes include a structure used as a musical theater, a three-story structure used as a religious and benevolent mission, a building used as a parsonage, and a highly improved, seventy-one acre farm. *Warwick Musical Theatre, Inc.,* 525 A.2d at 910; *Trustees of Grace and Hope Mission v. Providence Redevelopment Agency,* 100 R.I. 537, 538, 543, 217 A.2d 476, 477, 479 (1966); *Assembly of God Church,* 89 R.I. at 11, 150 A.2d at 16; *Hall v. City of Providence,* 45 R.I. 167, 168–69, 121 A. 66, 66–67 (1923). We have also held that the condemnation of a two-hundred-year-old historic home in Providence warranted departure from the comparable-sales method because of its rarity and uniqueness. *Corrado,* 117 R.I. at 657–58, 370 A.2d at 231–32. In the foregoing cases, therefore, this court approved alternative methods of property valuation. *E.g., Warwick Musical Theatre, Inc.,* 525 A.2d at 910; *Trustees, Etc.,* 100 R.I. at 543, 217 A.2d at 479. As a general rule, however, the market value of vacant land is considered always ascertainable. 4 Nichols, *The Law of Eminent Domain,* § 12.32[1] at 12–544 (J. Sackman 3d. rev. ed.1985). Accordingly, unless the vacant land has a special function, such as a turf research and design area, its valua-

tion by other than the comparable-sales method is not warranted. *See O'Donnell v. State,* 117 R.I. 660, 663–66, 370 A.2d 233, 235–37 (1977).

The trial justice, CPI maintains, erred (1) in not employing the comparable-sales method, and (2) in finding that the condemned land was special-use property. Furthermore, CPI argues, because its property is raw land with many possible uses and because an active market exists for land comparable to the condemned property, it simply is not special-use land. We agree.

In reviewing a judgment rendered by a trial justice sitting without a jury in a land-condemnation proceeding, we accord the justice's findings of fact and conclusions of law great weight, and they will be affirmed unless the trial justice " 'misconceived or overlooked material evidence or was otherwise clearly wrong.' " *Gorham v. Public Building Authority,* 612 A.2d 708, 712 (R.I. 1992); *Fuller v. Rahill,* 120 R.I. 832, 838–39, 391 A.2d 103, 106 (1978). The land taken constitutes vacant, unimproved land that was not being utilized in any specific or designated fashion. Under established law, such land simply does not amount to special-purpose property. Consequently, the trial court misapplied the law when it departed from the comparable-sales method and implemented the before-and-after method in valuing the land taken. *Cf. Warwick Musical Theatre, Inc.,* 525 A.2d at 910 (departure from comparable-sales method appropriate where theater building found to be used for a special purpose).

Even were we to assume, *arguendo,* that CPI's land is special purpose, the before-and-after approach would be precluded in this case by our decision in *Taber v. New York, Providence and Boston Railroad Co.,* 28 R.I. 269, 67 A. 9 (1907). Under *Taber* and its progeny, the state, in partial-takings cases, must compensate a landowner not only for the value of the land taken but also for any damage to the remainder. *Hetland v. Capaldi,* 103 R.I. 614, 616–17, 240 A.2d 155, 157 (1968); *Taber,* 28 R.I. at 283, 67 A. at 15. Damage to the remainder, if any, is measured by the difference between any special benefits and any special damages accruing

thereto. *D'Angelo v. Director of Public Works,* 89 R.I. 267, 270, 152 A.2d 211, 213 (1959)(citing *Allaire v. City of Woonsocket,* 25 R.I. 414, 416, 56 A. 262, 262–63 (1903)). Where special benefits produced by the condemnation equal or exceed special damages, the state need not compensate the landowner for damage to the remainder. *Taber,* 28 R.I. at 283, 67 A. at 15. Any advantage produced by benefiting the remainder, however, ends there; the state may not offset any excess special benefits to the remainder against the value of the part taken, for to do so would unconstitutionally undercompensate the landowner for the value of the land taken. *See id.* at 280–84, 67 A. at 13–15.

In adopting Benedict's before-and-after valuation method, the trial justice indirectly deducted special benefits to the remainder of parcels 2, 3, and 4 from the value of the land *actually taken* by including in the after-valuations assigned to parcels 2, 3, and 4 the value of special benefits resulting from the condemnation. Indeed, Benedict's own testimony indicates that the after-condemnation value assigned to parcels 2, 3, and 4 included $1.2 million of special benefits. By accepting the appraisal that deducted the special benefits from the value of the condemned land, the trial justice violated the teaching of *Taber* and thus denied CPI "just compensation but not a penny more." *Nasco, Inc.,* 116 R.I. at 721, 360 A.2d at 876. As justification, the trial justice primarily relied upon *Fuller v. Rahill,* 120 R.I. 832, 391 A.2d 103 (1978).

*Fuller,* based upon *United States v. Miller,* 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943) and *United States v. Reynolds,* 397 U.S. 14, 90 S.Ct. 803, 25 L.Ed.2d 12 (1970), stands for the proposition that when a condemnation is probably within the scope of a government project at the time of the project's inception, valuation of the land condemned at a later time should exclude any general enhancement in value produced by the existence of the project itself ("general benefits"). *Fuller,* 120 R.I. at 836–38, 391 A.2d at 105–06. In this case, however, it appears that the condemnation of CPI's land did not become even a possibility until ap-

proximately two years *after* the inception of the original Capital Center Project. The trial justice did not deduct the value of general benefits from the land actually taken; instead, he deducted the value of special benefits to CPI's remaining land from the value of the land actually taken. Even if the condemnation were within the scope of the Capital Center Project at the time of its inception, *Fuller* simply does not establish that the compensation for land actually taken may be reduced by the value of special benefits to the remainder.

Accordingly, under the circumstances of this case, *Fuller* is inapposite.

Accordingly CPI's appeal is sustained, the judgment appealed from is vacated, and the papers of the case are remanded to the Superior Court for a new trial.