DECISION
This petition for assessment of damages following a condemnation of land by the State of Rhode Island acting by and through its director of transportation comes before this court on remand from the Rhode Island Supreme Court's decision in CapitalProperties, Inc. v. State of Rhode Island, 636 A.2d 319 (R.I. 1994). Jurisdiction in this Superior Court is pursuant to Rhode Island General Laws § 37-6-1 et seq. For the reasons set forth herein, judgment will be entered for the plaintiff, Capital Properties, Inc., in the amount of six million one hundred thousand nine hundred and forty-nine ($6,100,949) dollars, plus interest and costs, representing the difference between the two million five hundred and ninety-nine thousand and fifty-one ($2,599,051) dollars that the State of Rhode Island has already paid for the condemned land and the eight million seven hundred thousand ($8,700,000) dollars that this court determines to be the fair-market value of the subject property as determined by a fair preponderance of the evidence after trial.
Facts and Background
The plaintiff in this retrial petition for assessment of damages, Capital Properties, Inc. (CPI), is a Rhode Island corporation with its principal offices at 920 Hospital Trust Plaza, Providence, Rhode Island. The defendant is the State of Rhode Island and Providence Plantations (State). This condemnation action involves land taken from the Capital Center Project in downtown Providence. The Capital Center Project began in 1981 when the Rhode Island General Assembly passed P.L. 1981, ch. 332, § 1. This Act provided for the "appropriate, comprehensive and coordinated development of railroad or former railroad properties and adjacent lands that are or may be the subject of railroad relocation projects involving federal, state, local and private action" by permitting "the creation of special development districts" together with "special development district commissions" empowered to adopt, to implement, and to administer plans of development of such districts. On January 27, 1982, the State, the City of Providence (the City), the Providence and Worcester Realty Company (PW), the National Railroad Passenger Corporation (Amtrak), the Federal Railroad Administration, and the Providence Redevelopment Agency signed a cooperative agreement (the cooperative agreement) for relocation of railroad tracks ensuring the essential prerequisite for commercial redevelopment of the thirty-acre parcel now known as the Capital Center District (Capital Center District). Subsequently, the Providence City Council, pursuant to R.I.G.L. § 45-24-4.1, established the Capital Center Development District and created a Capital Center Commission to coordinate the development of the district. Providence, R.I., Ordinance Ch. 1982-54, No. 493 (Sept. 10, 1982).
On December 29, 1982, the State, the City, PW, and Amtrak, the full property owners in Capital Center District, signed the Master Property Conveyance Contract (MPCC) which agreed to a series of land conveyances in Capital Center District which resulted in the establishment of eleven large development parcels, a new series of roads and open space improvements to support private development. Within the Capital Center District, PW retained several parcels of land, including Parcels 2, 3, and 4. The PW eventually became a wholly-owned subsidiary of CPI which, in turn, assumed ownership of Parcels 2, 3, and 4.
In 1985, the State and the City decided to move forward with the River Relocation Project, which affected the configuration of several parcels of land located in the Capital Center District. The River Relocation Project called for the condemnation of property owned by CPI in the Capital Center District. To further the River Relocation Project, on November 13, 1987, the State, by the Director of Transportation, acquired land and easements in the City by filing Plat No. 2128 in the Office of the Providence Recorder of Deeds. Said condemnation was filed pursuant to the provisions of Title 37, Chapter 6 of the General Laws of Rhode Island and pursuant to the provisions of Chapter 111 of the Public Laws of Rhode Island (the Taking). Condemnation Plat No. 2128 identifies the land and easements taken as Parcels 2G, 3A, 3B, 3C, 3D, 3E, 3F, 3Z, 4C, and 4D. The land and easements taken by the State pursuant to Condemnation Plat No. 2128 were all located within Parcels, 2, 3, and 4 of the Capital Center Project area in Providence, Rhode Island. At the time of the Taking, CPI held record title in fee simple to all of the land and easements condemned in the Taking. As part of Condemnation Plat No. 2128, the State condemned and took in fee simple 93,345 square feet of vacant and unimproved land. This fee simple taking included 84,628 square feet of dry land and 8,717 square feet of riverbed land. As a further aspect of Condemnation Plat No. 2128, the State condemned and took a permanent underground utility easement consisting of 1,383 square feet. Additionally, in connection with the Taking, the City conveyed Parcel 2F to CPI. Parcel 2F contains 6,240 square feet. As a result, the net land taken by the State included 78,388 square feet of dry land and 8,717 square feet of riverbed land.
By law, the State must pay what it determines to be the fair-market value of condemned land to the owner or owners of that land at the time of the Taking. The State determined the fair-market value of the land taken in fee simple by the State pursuant to Condemnation Plat No. 2128 to be worth two million five hundred ninety-nine thousand and fifty-one ($2,599,051) dollars. On or about November 12, 1987, the State made a payment of two million five hundred and ninety-nine thousand and fifty-one ($2,599.051) dollars to CPI as compensation for the Taking. The CPI disputed the State's determination of the fair-market value of the Condemned Land and maintained that the fair-market value of the Condemned Land at the time of the Taking was actually eight million seven hundred thousand ($8,700,000) dollars, resulting in a balance due of six million one hundred thousand nine hundred and forty-nine ($6,100,949) dollars.
This matter was initially tried in the Rhode Island Superior Court commencing on December 2, 1991. An appeal was taken on the judgment from that trial. The Rhode Island Supreme Court on January 24, 1994, remanded the case to this Court for a new trial. Capital Properties, Inc. v. State of Rhode Island,636 A.2d 319 (R.I. 1994). This matter was tried before this Court, without intervention of a jury, on August 15-18, September 12, and December 11-13 in 1995. Post trial memoranda were submitted by the parties by May 1996. The CPI made no claims for severance damages in this proceeding. Pursuant to the Rhode Island Supreme Court decisions in Capital Properties, Inc., this Court is required to determine the fair-market value of the land and interest condemned by the State in the Taking.
Law of the Case
Article I, § 16, of the Rhode Island Constitution provides in pertinent part that "[p]rivate property shall not be taken for public uses, without just compensation." Accordingly, this Court in land-condemnation cases must assure that the landowner receives fair and just compensation. J.W.A. Realty,Inc. v. City of Cranston, 399 A.2d 479, 483 (R.I. 1979). "Nevertheless, when there is a dispute over the reasonableness of the offer made by the condemning authority and judicial relief is sought, the litigant should receive just compensation but not a penny more." Nasco, Inc. v. Director of Public Works,360 A.2d 871, 876 (R.I. 1976). Just compensation includes the fair-market value of the land taken at the time of the Taking. Ocean RoadPartners v. State, 612 A.2d 1107, 1110 (R.I. 1992). The plaintiff, by bringing the petition for assessment of damages, has the burden of proving what the fair-market value of its taken land was on the date of taking. Nasco, 360 A.2d at 876 (R.I. 1976). Fair-market value amount should be based upon the most advantageous and valuable use of the land when taken. Sweet v.Murphy, 473 A.2d 758, 761 (R.I. 1984). In short, the plaintiff here is entitled to be put in as good a position, pecuniarily, as it would have been if its property had not been taken. Assemblyof God Church v. Vallone, 89 R.I. 1, 9 (1959).
The preferred method of ascertaining the fair-market value of land taken by condemnation is the comparable-sales method.Warwick Musical Theatre, Inc. v. State, 525 A.2d 905, 910 (R.I. 1987). Accordingly, evidence of comparable sales, when available, will generally serve to exclude the use of other methods of deducing fair-market value. Corrado v. Providence RedevelopmentAgency, 370 A.2d 226, 230 (R.I. 1977). Fair-market value is best evidenced by the "prices paid at or about the time of the taking and voluntary sales in the open market by willing buyers to willing sellers for parcels substantially similar and comparable to that taken." Id. at 653, quoting Manning v. RedevelopmentAgency, 238 A.2d 378 (R.I. 1968). "Similar factors, among others affecting comparability are: location and character of the property, proximity in time, and use to which the property is put." Id. at 654.
In cases involving the value of real estate, such value must be established, wherever feasible, on the basis of comparable sales cited by an expert witness who has laid a prior foundation consisting of the reasons or factors upon which the witness has relied in arriving the witness's opinion. Wordell v. Wordell,470 A.2d 665, 667 (R.I. 1984). The "value of real estate, whether for the purposes of compensation in eminent domain or otherwise, should be established by an expert witness familiar with the value in the locality where the real estate is situated." Id.
"Facts upon which the opinion of the expert is based must be stated; otherwise, `it becomes impossible to ascertain whether the conclusions drawn from them possess sufficient probative force; or are not mere conjecture or speculation.'" Ferland Corp.v. Bouchard, 626 A.2d 210, 214 (R.I. 1993)(quoting Gorham v.Public Building Authority of Providence, 612 A.2d 708, 717 (R.I. 1992)). (Citations omitted.) "If the expert fails to specifically set forth the factual basis for his conclusion, the court must disregard his testimony." Ferland, 626 A.2d at 214, BurrillvilleRacing Ass'n v. Tellier, 574 A.2d 749, 752 (R.I. 1990).
The quality of an expert's testimony goes to the weight or credibility that the expert is entitled to rather than the admissibility of his testimony. Sweet, 473 A.2d at 761. The trial justice, sitting as factfinder, determines the weight to be given to the testimony. It is the obligation of the trial justice in condemnation proceedings to determine which evidence is more convincing and to make factual determinations based on that evidence. Warwick Musical Theatre, 525 A.2d at 911. A trier of fact can accept the property valuation of one set of experts and reject that of another set of experts. Ferland, 626 A.2d at 215-216. "Just as a trial judge may pick and choose any evidence presented by law persons, he or she may do the same when dealing with evidence of experts." Id. at 216. "An expert's opinion based solely on the witness's experience in evaluating property, without detailing any specific reasons or factors, is entitled to no weight." Id., Nasco, 360 A.2d at 876.
In a condemnation proceeding, the existence of errors or inconsistencies in valuation testimony goes to the weight of the evidence and the credibility of the witness, not to the admissibility of such testimony. In re Condemnation,501 A.2d 1172 (Penn. 1985). Adjustments, and the extent of them, play a very important part and are relevant factors in determining fair-market value. Id. These adjustments, as to size, time and condition of the comparable properties, are to be considered by the fact-finder in determining the credibility of the valuation expert and the weight to be given to his testimony. Id. The trial judge has the duty of determining whether a sale is "judicially comparable." Id.; see also Warwick Musical Theatre, 525 A.2d at 910. "In reviewing a judgment rendered by a trial justice sitting without a jury in a land-condemnation proceeding, the justice's findings of fact and conclusions of law are accorded great weight, and they will be affirmed unless the trial justice misconceived or overlooked material evidence or was otherwise clearly wrong." Capital Properties, Inc. v. State, 636 A.2d 319, 323 (R.I. 1994)(quoting Gorham v. Public Building Authority, 612 A.2d 707, 7121 (R.I. 1992); Fuller v. Rahill, 391 A.2d 103, 106 (R.I. 1078)).
Discussion
The condemned land was part of Parcels 2, 3, and 4 in Capital Center. The Capital Center Project created a large area for extensive commercial development in downtown Providence. The Capital Center area is surrounded by the State Capitol building and grounds, the Roger Williams National Park, the renovated Old Union Station complex, and the adjoining access to the interstate highway system. The Capital Center also contains a new and modern railroad station with a hidden track system and an underground parking garage with roadways on top to service the station. The planners essentially removed all obstacles and improvements previously existing in this thirty-acre area between the Old Union Station and the State House and developed a complete plan for development of this site. The planners laid out and built new roads and sidewalks and determined the shape and size of the development parcels. They also laid out the building edges to ensure view corridors to the State House and other areas of historical or architectural significance. They further designed and built a system of parks, river walks, and open space in addition to building new bridges and underground utilities. Finally, the planners established design and planning procedures to ensure architectural quality, right down to details concerning streetlights.
In the case at bar, CPI disputes the State's determination of the fair-market value of the condemned land and maintains that the fair-market value of the condemned land at the time of the Taking was actually eight million seven hundred thousand ($8,700,000) dollars, resulting in a balance due of six million one hundred thousand nine hundred and forty-nine ($6,100,949) dollars. The issue presented to this Court is to determine the fair-market value of the condemned land, Parcels 2, 3, and 4, at the time of the Taking.
The Design and Development Regulations in effect prior to the adoption of the River Relocation Project describe the condemned land as follows:
 "Parcel #2 has as its outstanding advantage approximately three hundred (300) feet of frontage on the new Waterplace and more than three hundred (300) feet of frontage facing across the Woonasquatucket River to the Boulevard . . .
 "Parcel #3 is the only parcel east of the Moshassuck River, located in close proximity to both the East Side and the financial district. More critically, Parcel 3 sits astride the long corridor of space created by the decking of the Providence River and presently anchored at the northern end only by Roger Williams memorial column. Low to medium rise development is required for Parcel 3 to complement the more intensive development of Parcel 4, while offering a transition to the smaller scale of the East Side. Because this development will be the end piece to a remarkable collection of monumental architecture lining the Providence River corridor, it must strive for solidity without height, in order to give the northern flanks of Memorial Square a visual edge.
 "Parcel #4 sits at the heart of the greatest expanse of commercial development projected in the Development District. It presents a major opportunity for offices, incorporating low, medium and high rise structures. A high rise office tower is recommended for the southwest corner of the Parcel, on axis with the Boulevard. Such a high rise will establish the visual prominence of the site for all traffic approaching downtown from the Civic Center Interchange.
 Facing the Boulevard on the South and the Alley on the north, the Parcel offers both grand exposures and intimate settings for building entrances. On the fifth side, Parcel 4 faces the Moshassuck River, which will be the only stretch of River Walk with commercial development on both sides. This setting should offer a special place for small-scaled, urban, riverfront activities."
As was stated previously, in Rhode Island, evidence of comparable sales, when available, will generally serve to exclude the use of other methods of deducing fair-market value. CapitalProperties. Inc., 636 A.2d at 321; Corrado, 370 A.2d at 230. In this case, comparable sales are available to determine the fair-market value of the condemned land and therefore the comparable-sales method must be used. See generally, CapitalProperties, Inc., 636 A.2d 319 (R.I. 1994). In a partial taking, such as the Taking here, it is error to value the part taken as if it stood alone. The appropriate inquiry is what was the value of the land taken when it was part of the larger parcel. 4A Nichols, The Law of Eminent Domain, § 14.02[2] at 12-32 (J. Sackman 3d. ed. 1985). Furthermore, CPI has the burden of proving what it seeks and claims. See generally, Nasco, 360 A.2d 871.
In this case, the plaintiff, CPI, presented the testimony of Webster Collins (Collins), a senior appraiser with thirty years of experience. Collins is currently a vice president and partner at Whittier Partners in Boston, MA. His appraisal assignments range from residential properties to multiple use commercial development projects. He also has had considerable experience in Rhode Island, beginning in 1972, and has demonstrated a thorough familiarity with downtown Providence. He has written numerous articles published in several trade magazines and has been a witness in courts of general jurisdiction throughout New England as well as in Minnesota, Georgia, and California. He has a Bachelor of Science degree from Lehigh University and an MBA from Boston University. This Court finds that the Collins appraisal is cogent, credible, and reliable and rests on the comparable-sales method using actual sales of large commercial parcels in close proximity to the condemned land. Collins testified that he employed the comparable-sales method of property valuation and selected six comparable sales which he believed to be comparable to the subject property to determine the fair-market value of the taking. The comparable sales selected are as follows:
 Sale # Address
 (#1) 71 West Exchange Street (Rao) (#1A) 71 West Exchange Street (Macomber) (#2) 90 Fountain Street (Gilbert) (#3) Parcel 12 (#4) 65 Sabin Street (Bonanza) (#5) 121 West Exchange Street (Amtrak)
After an analysis of each of these properties regarding location, size, shape, and market condition, Collins concluded that the comparable sale most similar to the condemned land was the Rao parcel. The Rao parcel is located on the corner of Gaspee and West Exchange Streets. In 1988 this area was a transition area outside of the Central Business District of Providence. Collins testified that the Rao parcel and the condemned land were both unimproved, flat commercial property in the Capital Center Project. He testified that the location of the Taking is comparable to the location of the Rao parcel. The Rao parcel was sold twice in 1988. The parcel consisted of 60,005 square feet. John C. Rao (Rao) sold the land to Macomber Development (Macomber) for one hundred and four dollars and sixteen cents ($104.16) per square foot (psf) on September 15, 1988. Macomber shortly thereafter, on October 28, 1988, sold the property to the Convention Center Authority for one hundred and ten dollars and eighty-two cents ($110.82) psf. Collins testified that he made no adjustment to the Rao property for location and only a 5 percent adjustment to the Rao parcel for price.
The Gilbert parcel is located on the corner of Fountain Street and Mathewson Street, outside of the Central Business District. This large, unimproved commercial lot of 35,704 square feet sold for one hundred and five dollars and three cents ($105.03) psf in October of 1990. Collins testified he made a 10 percent adjustment in this parcel for location and price when compared to the Taking.
The City of Providence sold Parcel 12, a triangular lot of 24,294 square feet, created as a result of the River Relocation Project, to the Providence Redevelopment Agency for ninety-nine dollars and eighty-two cents ($99.82) psf on June 10, 1989. Parcel 12 is located directly across the river from Parcels 2, 3, and 4. Collins made no adjustment in this parcel for location and a 10 percent adjustment for market.
Collins testified that the Amtrak parcel of 98,351 square feet and the Bonanza parcel of 138,768 square feet, are more distant from the Central Business District and are surrounded by highways and less valuable properties. These lots do not enjoy the amenities of the rivers, river walks, or the parks located in Capital Center, and Collins testified that these lots are not as valuable or as desirable as the Taking. These parcels sold for seventy-two dollars and nineteen cents ($72.19) psf and seventy-three dollars and ninety-three cents ($73.93) psf, respectively. Collins made no adjustments to these parcels for market and only 10 percent to each for location as inferior to the property of the Taking.
This Court finds that these comparable sales all occurred within a few years of the date of the Taking and are all located near the subject property. These comparable sales were all large, vacant parcels, with the exception of the Bonanza parcel and the Gilbert parcel which had antiquated buildings on site which were assigned no value by Collins. Furthermore, the comparable sales all occurred in a commercial downtown zone with four of the comparable sales (Rao, Macomber, Parcel 12, and Amtrak) located in Capital Center in close proximity to the Taking. A fifth comparable sale, Bonanza, was located across the street from Capital Center. Collins' comparable sales averaged about one and one-half years from the date of the Taking and not one occurred more than three years from the date of the Taking. The unadjusted sale prices for the six comparables ranged from approximately seventy-two ($72) dollars psf to one hundred and eleven ($111) dollars psf with four of the six sales prices approximately at or above one hundred ($100) dollars. Collins then made minor adjustments with an average adjustment per comparable of 10 percent to conclude that the average unadjusted sale price of the comparable sales was one hundred and six dollars and thirteen cents ($106.13) psf. Collins then concluded that the Taking was at least as valuable as the land involved in his comparable-sales analysis and therefore valued the subject property at one hundred and ten ($110) dollars psf. Collins then valued the riverbed land to be worth ten ($10) dollars psf. Values for the respective categories of land in the taking are:
 Seventy eight thousand three hundred eighty-eight (78,388) square feet of dry land valued at one hundred ten ($110) dollars per square foot for a total value of eight million six hundred twenty-two thousand six hundred eighty ($8,622,680) and eight thousand seven hundred seventeen (8,717) square feet of wetland valued at ten ($10) dollars per square foot for a value of eighty-seven thousand one hundred seventy ($87,170) dollars. The total damages testified to by Collins resulting from the taking is eight million seven hundred nine thousand eight hundred fifty ($8,709,850) dollars.
This Court finds that the testimony of Collins in every respect was probative, relevant, credible, and persuasive on the question of the value of the Taking. Accordingly, this Court finds that the comparable sales chosen by Collins form the basis for the determination of the fair-market value of the Taking. This Court also finds as a fact that Collins thoroughly studied the appraised land and considered trends in the real estate market, made appropriate adjustments for typical comparative factors in conformity with recognized practices in the field of real estate appraisal, including market condition, location, size and shape, and thoroughly explained the basis for each adjustment. This Court finds that Collins' reliance on the Ryan-Elliot Reports provided an appropriate indication for office space demand in downtown Providence. Collins demonstrated, through the use of the Ryan-Elliot Reports, that office space demand peaked at, or approximately at, the time of the Taking. This Court finds that Collins' reliance on the PMSA Statistics provided appropriate information concerning job growth in the metropolitan area. Collins demonstrated, through the use of the PMSA statistics, that there was strong evidence of job growth in and around Providence at, or approximately at, the time of the Taking, at the same time realizing that the PMSA contains territory outside of the City of Providence. This Court further finds that based upon all of the evidence the condemned land was as valuable as the Rao parcel and that other comparables used were appropriate parcels for comparison. Therefore, this Court accepts Collins' opinion that the fair-market value of the subject property at the time of the taking was worth one hundred and ten ($110) dollars psf for the dry land and was worth ten ($10) dollars psf for the riverbed land. This Court finds that the total fair-market value of the subject property on the date of the Taking was worth eight million seven hundred thousand ($8,700,000) dollars.
In this case, the State offered the testimony of Lido Jerome (Jerome). Jerome has been in the real estate appraisal business for thirty-five years. He has extensive appraisal experience in the State of Rhode Island with 80 percent to 90 percent of his business being in Rhode Island. Additionally, Jerome worked for several years as a deputy assessor for the City of Providence. In that capacity, he was responsible for appraising all new construction in the City of Providence during his tenure. Jerome also worked in a tax equalization program where he reassessed and revalued properties in the financial district. The Court determined that Jerome was qualified as a real estate appraiser to testify in this case.
Jerome valued the condemned land by using the comparable-sales, land-comparison approach. This approach, which was also used by Collins, involves finding comparable sales similar to the subject property and making adjustments to reflect the difference in the fair-market value of the properties. This Court finds that Jerome selected four parcels for comparable sales but relied primarily on the comparable sales located at 380 Westminster Street and 30 Pine Street with less emphasis on parcels at 172-176 Washington Street and 146-150 Smith Street. Jerome concluded, based upon these comparable sales, that the subject property was worth fifty ($50) dollars psf, and therefore, valued the taking to be worth three million nine hundred and sixty-three thousand two hundred and fifty ($3,963,250) dollars.
This Court finds as a fact that these comparable sales were not the best parcels to compare to the subject property for three reasons: 1) because substantially different market conditions existed at the time of the Taking as compared to the time of Jerome's comparable sales, and 2) because Jerome's comparables were not valid comparables to the condemned land because of the location of Jerome's comparables in relation to the subject property, and 3) because the size of Jerome's comparables ranging from 3,284 square feet to 29,685 square feet required too great an adjustment when compared to the subject property sizes of between 80,000 and 90,000 square feet.
Jerome's comparable sales occurred under substantially different market conditions than existed at the time of the Taking. The 380 Westminster Street sale occurred on October 31, 1981, more than six years before the Taking. This Court finds this sale to be too remote in time to be a satisfactory comparable to the subject property, considering all the circumstances of this case. The 30 Pine Street sale occurred on May 5, 1985, two and one-half years before the date of the Taking. This Court finds that the changes which occurred in the market conditions during the 1980s demonstrates that neither sale is comparable to the condemned land. All experts testifying in this case agree that there were huge swings in the Providence real estate market between 1981 and 1987. In 1981 the economy was in a major recession and the real estate market was depressed. In the next four years the real estate market began to rise. The increases in value then accelerated dramatically. Jerome acknowledged that in his opinion the increases in the real estate prices in downtown Providence between 1985 and 1987 were the most substantial increases to take place in the past thirty-five years encompassing his career. Jerome further acknowledged that in a rapidly increasing real estate market such as that which existed at the time of the Taking, it is difficult, if not impossible, to make reliable market condition adjustments.
The 380 Westminster Street sale occurred in 1981, when the prime rate was 19 percent, unemployment was 8.5 percent, and the economy was in a recession. The conditions present at the time of the Taking, when the prime rate was 8.5 percent and unemployment was 3.2 percent, indicate that the economy and the real estate market were very strong. All of these factors significantly influenced real estate prices. This Court finds that in light of the extraordinary price increases during the time of the Taking, those comparable sales selected before the real estate boom that occurred in the mid 1980s would understate the fair-market value of the condemned land. Jerome's selected comparable sales led him to make massive market condition adjustments. This Court finds that these massive market condition adjustments demonstrate that Jerome's selected comparable sales were not the best comparable sales to establish fair-market value of the Taking.
This Court further finds that Jerome's selected parcels one through four as comparable sales were not valid as comparable sales because of their location. The condemned land was part of three prime commercial development parcels in Capital Center. The condemned land provided an optimal location for class A buildings with such amenities as parks, river walks, roads, streetlights and view. In 1981, 380 Westminster Street was a secondary location, far removed from the Central Business District, with few amenities. Similarly, in 1985, 30 Pine Street was a service station. Furthermore, this location also presented no opportunities for first-class office buildings because the property was too small. Jerome's sales 3 and 4 on Washington Street and Smith Street were similarly removed from the Central Business District. This Court finds that Jerome's comparable sales were not appropriate comparable sales due to the superior locations of Parcels 2, 3, and 4 at the time of the Taking.
The size of all of Jerome's selected comparables, in addition to being located outside of the central business district in which the subject property was located, paled in comparison to the subject property's size and the potential development uses.
Jerome's sale 1 was located at 380 Westminster Street and was 29,685 square feet. This was by far Jerome's largest comparable sale. Sale 2, Jerome's second most preferred site, was located at 30 Pine Street. This comparable contained 5,684 square feet and contained a one-story, brick garage. Sale 3 was located at 172-176 Washington Street and contained 3,284 square feet and sale 4 was located at 146-150 Smith Street, containing 7,600 square feet, and was used as a gas station.
All of these parcels in this Court's judgment were not comparable to the subject property either in time of Taking, location and size. As a result, the Court rejects Jerome's testimony as competent evidence to establish the value of the subject property at the time of the Taking for the reasons stated as well as for the inordinate adjustments which had to be made for each sale when compared to the subject property of the Taking.
The State also offered the testimony of Mr. Norman Benedict (Benedict). Benedict is a graduate of Yale University with a degree in Economics. He is a member of the American Institute of Real Estate Appraisers and is designated as a Senior Real Estate Analyst. He has had broad experience in the real estate appraisal field since 1960, has lectured and has written extensively on the subject, and continues to do so. He is president and treasurer of Norman Benedict Associates, Inc., as well as its majority stockholder. He has had substantial real estate appraisal experience in the Rhode Island market. The Court determined that he was competent to testify as a real estate appraiser in this case.
Benedict, in his testimony, did not rely on the comparable-sales approach to evaluate the Taking as did Jerome and Collins. Benedict utilized what he described as a statistical approach or a paired date sales approach in which the selected parcels are evaluated according to adjustments deemed appropriate by Benedict.
In his analysis Benedict relied on six parcels to form the basis of his opinion from a neutral field which included thirteen other parcels which he evaluated but did not believe to be comparable to the subject property.
Of the six parcels relied on by Benedict, five of these parcels were also used by Collins to form the basis of Collins' valuation of the taking. Benedict, in his appraisal method, made adjustments to the six parcels selected for characteristics such as time, class of usage, size, shape, and square footage to front footage ratio, as well as adjustments for advertising quality and shape quality.
Five of Benedicts thirteen comparables not relied on were sales occurring between 1980 and 1981, some six or seven years prior to the Taking. Many of these parcels were located more than one mile outside of downtown Providence.
In a previous trial concerning this case, the Supreme Court determined that the subject property of the Taking was not unique and that the method of valuation of this Taking should be determined via the comparable-sales method. (Capital Properties,Inc. vs. State of Rhode Island severally, supra.)
It is clear from the testimony that the method of valuation chosen by Benedict in the case at bar was not an analysis based on the recognized, preferred, direct sales comparison approach. Further, it is clear from the testimony of Benedict that the method used by him in establishing the value of the Taking was not done according to any recognized or generally accepted real estate appraisal method.
Under questioning it was evident that the method used by Benedict involved his assessment of nineteen sales identified by him as comparable sales and of that number five were used for direct comparison with the subject property of the Taking. The entire nineteen were used to make estimates of what were reasonable adjustments to make to translate those five sales into value indications for the appraised property (the Taking).
The Court has previously noted that a good portion of the thirteen sales so evaluated have no comparison to the subject property in character, location, or time of sale.
In addition, by Benedict's own admission, the methodology he used to arrive at his valuation of the Taking is one which he conceded was becoming accepted in his field but was not at this time generally so.
In light of the established case law regarding the use of generally accepted real estate appraisal practices and the use of comparable sales when those sales are available, this Court finds that Benedict's methodology violates the standards established by the Rhode Island Supreme Court. This Court finds, therefore, that Benedict's testimony is not reliable, probative or relevant to the fair-market value of the subject property of the Taking.
To compound matters further, even if Benedict's appraisal method was in accord with accepted real estate appraisal practices, Benedict's original appraisal report dated June 20, 1995, is flawed and this Court finds as a fact is not reliable or probative on the question of value.
On the first day of trial, pursuant to a conference with this Court, the parties exchanged appraisal reports and Benedict supplied a copy of his original report to CPI. In this original report, Benedict mistakenly reported the "time adjusted" sales prices rather than the actual sales prices for three of his comparables. Because of these clerical mistakes, Benedict reported a value opinion of four million six hundred thousand ($4,600,000) dollars. When these clerical mistakes were corrected, Benedict's actual value opinion increased by approximately six hundred and thirty-one thousand ($631,000) dollars. Benedict discovered these clerical mistakes on the third day of the trial and then made a series of new downward adjustments to his appraisal report which precisely offset the increase resulting from his clerical mistake. The net effect of these new downward adjustments exactly offset the increase in Benedict's value opinion which resulted from correcting the clerical mistakes. Benedict claimed that it was just a coincidence that his mid-trial revisions precisely offset the increase resulting from his clerical mistakes. As was stated previously, when a trial justice is sitting as fact-finder, it is the obligation of the trial justice to determine which evidence is more convincing and to make factual determinations based on that evidence. Warwick Musical Theatre, 525 A.2d at 911. This Court finds that Benedict was not convincing or credible in his testimony discussing his response to his clerical mistakes.
Therefore, this Court rejects Benedict's testimony because his statistical methodology violates the rules set forth by the Rhode Island Supreme Court, and his explanation of his clerical mistakes and subsequent mid-trial revisions are not credible or reliable.
Conclusion
Based on a review of the testimony of all parties in this case, an analysis of all exhibits, reports, schematics, and all physical evidence, this Court finds as a matter of fact and as a conclusion of law that based on the probative, relevant, and credible evidence of the witness Webster Collins that the plaintiff has proved by a fair preponderance of the evidence that the value of the subject property taken by the State of Rhode Island has a fair-market value of eight million six hundred twenty-two thousand six hundred eighty ($8,622,680) dollars based on 78,388 square feet of dry land at the rate of one hundred ten ($110) dollars per square foot and eighty seven thousand one hundred seventy ($87,170) dollars for 8,717 square feet of wetland valued at ten ($10) dollars per square foot for a total of eight million seven hundred nine thousand eight hundred fifty ($8,709,850) dollars.
Judgment may enter for the plaintiff in this amount plus interest and costs minus any monies previously paid by the defendant pursuant to the statute.