Bradford GORHAM et al.

v.

PUBLIC BUILDING AUTHORITY OF THE CITY OF PROVIDENCE.

No. 91–294–Appeal.

Supreme Court of Rhode Island.

July 14, 1992.

Douglas R. DeSimone, Herbert F. DeSimone, DeSimone & Leach, Providence, for plaintiffs.

Thomas C. Angelone, Hodosh, Spinella & Angelone, Patrick T. Conley, City Sol., Bruce Sondler, Mal Salvadore, Providence, for defendant.

OPINION

FAY, Chief Justice.

The defendant, the Providence Public Building Authority (PPBA), appeals from a Superior Court condemnation proceeding

whereby the plaintiffs, Bradford Gorham (Gorham) and Herbert DeSimone, coadministrators of the estate of Corrine E. Joslin (estate) were awarded $9,246,186.38 plus interest and costs. The defendant avers that the trial justice erred by (1) applying an incorrect date for purposes of establishing when a taking had occurred and (2) misconceiving and overlooking material evidence on a controlling issue. For the reasons stated herein, the Superior Court judgment is reversed and the case is remanded for a new evidentiary hearing.

Corrine E. Joslin (Joslin) died on March 23, 1984. Thereafter her will was admitted to probate, and on November 25, 1988, plaintiffs were appointed as coadministrators of the estate. Joslin's will left, inter alia, approximately 543 acres of land in the town of Scituate delineated as lot Nos. 45, 48, 49, 60, 61, 62, and 63 on tax assessor's plat No. 51, otherwise known as the Joslin Farm (Joslin Farm). The Joslin Farm is located on Field Hill Road and abuts the Scituate Reservoir watershed. The Scituate Reservoir provides a vast majority of Rhode Island citizens with drinking water.

In 1987 the General Assembly passed the Municipal Public Buildings Authorities Act that was thereafter codified as chapter 50 of title 45, of the General Laws. P.L.1987, ch. 475, § 1. Chapter 50 of title 45, empowered each city and town to establish a Public Building Authority (PBA), which would afford each community an alternative financing and administrative mechanism to effectuate certain enumerated types of public-improvement projects. In accordance with the foregoing statutory authorization, in 1988 the Providence City Council and the Public Finance Management Board of the State of Rhode Island authorized the creation of the PPBA.

Among the powers granted to a PBA by chapter 50 of title 45, was the authority contained in § 45–50–13, that empowers cities and towns with the authority to acquire by eminent domain land located within the boundaries of their respective cities and towns. In addition in 1989 the General Assembly passed P.L.1989, ch. 298, which amended G.L.1956 (1988 Reenactment)

§ 45–50–13 by expanding the powers given to a PBA so that it could acquire by eminent domain either the development rights to, or fee simple ownership of, certain properties, including but not limited to properties surrounding the Scituate Reservoir. Specifically, § 45–50–13 provided in pertinent part:

"(a) The authority shall have the right to acquire any land, or any interest therein, including development rights by the exercise of the power of eminent domain, whenever it shall be determined by the authority that the acquisition of the land, or interest, is necessary for the construction or the operation of any project.

"(1) The power of eminent domain shall be exercised only within the boundaries of the city or town whose council established the authority, except that any authority in existence on the effective date of this act shall have the power to acquire, by exercise of eminent domain, only the development rights, except as set forth in subsection (5), in the land described in the tax assessor's plats for the towns of Foster, Scituate, Johnston and Glocester as of February 14, 1989, for the purpose of protecting the water supply as follows:

\*     \*     \*     \*     \*     \*

"(2) In addition to the powers previously granted, any authority in existence on the effective date of this act shall have the power to acquire by exercise of eminent domain the land, or any interest therein, described as that certain land situated in the town of Scituate \* \* \* commonly known as the *'Joslin Farm'* for the purpose of protecting the water supply." P.L.1989, ch. 298, § 1. (Emphasis added.)

Over concerns for the safety of its water supply, on February 24, 1988, the Providence Water Supply Board of the City of Providence (city) published in the *Providence Journal* a notice of intention to acquire land in the Scituate watershed area. Thereafter, between 1988 and 1990, the city entered into negotiations with the estate in an attempt to reach an agreed-

upon purchase price for the sale of the Joslin Farm.

Section 45–50–13(a)(6) set forth the method by which to determine the fair-market value of the properties or development rights sought to be acquired by a PBA. The PBA and the landowner each appoint an appraiser to make an independent determination of the property's fair-market value. If the difference between the two appraisals is less than 10 percent of the lesser appraisal, the two appraisals will be averaged. If the difference exceeds 10 percent of the lesser appraisal, then the two appraisers will appoint a third appraiser to make an independent appraisal. The three appraisals are then compared, and the two closest appraisals will be averaged to determine the fair-market value. The remaining appraisal is dropped.

Pursuant to the requirement of § 45–50–13(a)(6), in 1988 the city hired an appraiser, Joseph Accetta (Accetta), to appraise the value of the Joslin Farm. Accetta valued the subject property at $4,400,000. Likewise, the estate hired an appraiser, J. Clifden O'Reilly, Jr. (O'Reilly), who determined the value of the Joslin Farm to be $9,725,000. Because of the disparity in the respective appraisals, in accordance with the provision of § 45–50–13(a)(6), a third appraiser, Peter Scotti (Scotti), was employed. He appraised the value of the Joslin Farm at $6,150,000. O'Reilly's appraisal was dropped and Accetta's and Scotti's appraisals were averaged for a fair-market value of $5,275,000. Thereafter, the PPBA submitted a written offer for this amount to the estate; however, the offer was rejected.

On December 12, 1990, following the failure of the PPBA and the estate to reach an agreed-upon purchase price for the Joslin Farm, the PPBA, pursuant to § 45–50–13(b), enacted a resolution declaring the necessity of acquiring the Joslin Farm by eminent domain. Thereafter, on December 27, 1990, the PPBA filed a copy of the resolution together with a plat of the Joslin Farm in the Scituate land evidence records. Further, on January 2, 1991, pursuant to § 45–50–13(b), the PPBA filed in the Superior Court a statement of the estimated sum of $5,275,000, an amount considered to be just compensation for the Joslin Farm. On January 4, 1991, the PPBA deposited $2,637,500 into the registry of the court, an amount representing one-half of the amount of the estimated value of just compensation.

Also on January 4, 1991, in order to contest the amount of compensation required, the estate filed a separate petition for an assessment of damages. The parties agreed to bifurcated nonjury trials: the first to determine the date of the taking and the second to make an assessment of the amount of damages based upon the determined date of taking. The trial was commenced on April 8, 1991.

At trial Gorham indicated that prior to the 1989 amendment to § 45–50–13 specifically authorizing the PPBA's acquisition of the Joslin Farm, he received weekly purchase inquiries from real-estate brokers, attorneys, and other interested parties. Furthermore, he argued, as soon as the city's plans to acquire the Joslin Farm became known, the property's value was substantially diminished and the number of purchase inquiries decreased dramatically.

Although the actual condemnation date was January 4, 1991, the trial justice, in relying on Gorham's testimony, noted:

"The court is well aware of the fact that in a usual condemnation case the fair market value is determined as of the date of the actual taking, I think this case is unusual for a number of reasons. Mr. Gorham testified that prior to the enactment of legislation controlling or authorizing the condemnation of certain properties to protect the watershed of the Scituate Reservoir * * * he received weekly inquiries from various people, attorneys, principals, real estate brokers, and so on once it became a known fact that * * * the Joslin Farm was going to be condemned. Now the inquiries ceased. I think fundamental fairness dictates that the day of taking as far as the Joslin Farm is concerned should be the date of the enactment of the legislation, July 7, 1989. I think to do other-

wise would be unjustly unfair to the plaintiffs in this particular case. I therefore find as a fact that the actual date of the taking was July 7, 1989, the enactment of the Public Laws 1989, Chapter 298."

Thereafter, the court considered the value of the Joslin Farm as of July 7, 1989. O'Reilly, the appraiser hired by the estate, testified that he believed that the best use for the Joslin Farm would be to subdivide part of the property into lots for single-family residences and reserve the other parts for either gradual residential development or for passive recreational use such as a golf course. O'Reilly noted that a golf course would be permitted by way of a special exception to the Scituate zoning code. Further, in appraising the value of the property at $9,725,000, O'Reilly indicated that he used June 30, 1989, as the appraisal date and that he applied a comparable-sales methodology to determine the projected value of the property. Specifically, he appraised the portion of the property characterized as being appropriate for residential lots at a value of $5,225,000. The remaining property deemed appropriate for use as a golf course was appraised at $4,500,000.

Accetta, the appraiser hired by the city, testified that he believed that the only practical and significant way to appraise the value of the Joslin Farm accurately was by means of application of the market-data approach, otherwise known as the comparable-sales method. He further testified that he determined that the best use of the property would be for the residential development of single-family homes. Using January 12, 1988, as the appraisal date, Accetta valued the property at $4,400,000. In arriving at this figure, Accetta calculated the approximate number of available lots, multiplied that figure by the per-lot value, and subtracted the developmental and marketing costs.

Accetta testified further that he had acted as a supervisor overseeing the field appraiser, Elaine Mondillo (Mondillo). He indicated that he assisted with the appraisal and viewed the site with Mondillo. According to Accetta, he and Mondillo conducted a wintertime inspection of the exterior portions of the buildings and viewed as much of the land as possible despite the accumulation of snow on the ground.

Last, Scotti, the appraiser appointed pursuant to § 45–50–13(a)(6), testified that he applied October 10, 1989, as the effective date of the appraisal and, as indicated, valued the property at $6,150,000. He applied a land-development approach and a comparative-sales methodology in ascertaining the fair-market value of the property and, in doing so, accounted for developmental costs, including engineering and water-table studies and the necessity of obtaining approval from the Department of Environmental Management.

Despite the absence of any evidence concerning the actual development costs of constructing a golf course or the estimated cash flow from such a project, on May 17, 1991, the trial justice concluded that O'Reilly's appraisal was accurate. Accetta's appraisal was rejected because the trial justice concluded inter alia that Accetta had failed to do the appraisal himself and had never viewed or entered upon the property, nor did he take the opportunity to "appreciate the pristine view." Likewise, the trial justice did not accept Scotti's appraisal because following Scotti's plan of development would result in the lots' being "long, narrow, deep, [and] irregular."

Judgment was entered on May 23, 1991, whereby the estate was awarded damages in the amount of $9,797,200 plus interest calculated from July 7, 1989, and costs. Taking into account the city's payment of $2,637,500 into the court registry on January 4, 1991, the total amount due was $9,246,186.38. Thereafter, on June 6, 1991, the PPBA filed a notice of appeal.

I

Article 1, section 16, of the Rhode Island Constitution provides that "[p]rivate property shall not be taken for public uses, without just compensation." Likewise, the Fifth Amendment to the United States Constitution, as made applicable to the states through the Fourteenth Amendment,

states, "[N]or shall private property be taken for public use, without just compensation." When governments exercise the right to acquire private property by eminent domain, courts are oftentimes required to address questions pertaining to the establishment of a proper date of taking and the amount of just compensation. This case presents this court with the task of answering these very questions.

The PPBA avers that the trial justice erred in establishing July 7, 1989, the date upon which P.L.1989, ch. 298, was signed into law, as the proper date of the taking. Rather the PPBA asserts that the trial justice disregarded legal precedent that has established the proper date of taking for purposes of valuation as the date that title passes to the condemning authority, which is generally the date the condemnor becomes entitled to immediate possession of the property. According to the PPBA, the proper date of taking should have been January 4, 1991, the date on which the PPBA deposited $2,637,500 into the registry of the court.

Further, the PPBA claims that the trial justice, in setting the date of the act's passage as the date of taking, misinterpreted the provisions of § 45–50–13. The PPBA asserts that § 45–50–13 merely empowered the PPBA with the authority to acquire certain enumerated parcels of land whenever it determines such action is required. However, under this authorization, the PPBA need not ever condemn the land. The PPBA claims that the discretionary language set forth by § 45–50–13 does not amount to a vesting of title in and of itself, nor does the diminution of the property's value following the enactment of § 45–50–13 constitute a taking. Furthermore, the PPBA posits that any chilling effect on the value of the Joslin property in the wake of the impending condemnation was accounted for in the comparable-sales valuation process itself.

Conversely the estate contends that the trial justice's decision was proper because it was based upon equitable principles of fairness. The estate recognizes that general rules are typically applied in determining the date of taking and the amount of just compensation; however, it claims that in accordance with equitable principles of fairness, exceptions have been carved out of these rules in order to avoid unjust or unfair results. Accordingly the estate avers that the decision of whether to apply the general rules or to carve out exceptions is to be determined on a case-by-case basis.

In support for the foregoing proposition, the estate posits that the market for the Joslin Farm evaporated following the 1989 amendment of § 45–50–13 authorizing the acquisition of the subject property. Hence, the estate contends that July 7, 1989, the date § 45–50–13 was amended, was in fact the proper date of taking.

As previously noted, in rendering his decision with respect to the date of taking, the trial justice, although he indicated that he was aware that in the usual condemnation cases the date of taking is the date of actual taking, nevertheless departed from the general rule because he believed this case to be "unusual for a number of reasons." Unfortunately the trial justice failed to elaborate what the reasons were. However, he did note that because the testimony indicated that the market inquiries for the Joslin Farm dramatically diminished following July 7, 1989, the date on which P.L.1989, ch. 298, was enacted, fairness required that he depart from the general rule and set July 7, 1989, as the actual date of taking.

We have consistently held that "the findings of a trial justice sitting without a jury are accorded great deference and will not be disturbed unless it is demonstrated that the trial justice misconceived or overlooked material evidence or was otherwise clearly wrong." *Green v. Green,* 559 A.2d 1047, 1048 (R.I.1989) (citing *Oster v. Tellier,* 544 A.2d 128, 131 (R.I.1988)); *see also Warwick Musical Theatre, Inc. v. State,* 525 A.2d 905, 910 (R.I.1987).

■ "It is well-established that in a condemnation proceeding a property owner is entitled to just compensation for the fair market value of the property as of the date of taking." *O'Donnell v. State,* 117 R.I. 660, 665, 370 A.2d 233, 236 (1977) (citing

*Palazzi v. State*, 113 R.I. 218, 319 A.2d 658 (1974); *Travellers Building Association v. Providence Redevelopment Agency*, 106 R.I. 83, 256 A.2d 5 (1969)). However, just when a taking occurs is a subject generating great diversity of opinion. Nevertheless, we have held that a taking does not necessarily occur when an actual entry is made upon the land by the condemning party but rather occurs when the right to enter and take possession accrues. *In re Southern New England Railway Co.*, 38 R.I. 246, 249, 94 A. 738, 739–40 (1915). The condemning authority's right to possession generally accrues upon the passage of title. *Whitman v. City of Providence*, 44 R.I. 33, 35, 114 A. 183, 184 (1921) (date of taking was determined to be the date title to the condemned property passed to condemning authority, giving the authority the right to possession); *Daigneault v. City of Woonsocket*, 18 R.I. 378, 380, 28 A. 346, 346 (1893) (date of condemnation is the date when title to the land vested in the city).

With respect to the question of when title passes, the Supreme Court has held that unless the condemning authority has taken physical possession of the property, title passes for purposes of the establishment of a taking upon payment of compensation by the condemnor. *Kirby Forest Industries, Inc. v. United States*, 467 U.S. 1, 11, 104 S.Ct. 2187, 2195, 81 L.Ed.2d 1, 11 (1984) (citing *Danforth v. United States*, 308 U.S. 271, 60 S.Ct. 231, 84 L.Ed. 240 (1939)). Further, one respected authority has noted that

"[i]n several states it is held that the filing of the petition to condemn, being the first actual step toward devoting the property to a public use, marks a point of time that is as fair and just to both parties for fixing the value of property * * * and it has * * * been adopted as the established date as of which damages are assessed." 3 Nichols, *The Law of Eminent Domain*, § 8.5[2] at 8–108 (1985).

Nichols suggests further that "[w]hen the body empowered to act under the right of eminent domain is not required to make a formal taking, damages are assessed as of the date of initial physical interference with

the rights for which compensation is given." 4 Nichols, *The Law of Eminent Domain*, § 12.23[1] at 12–121 (1985). Last he notes that the Uniform Eminent Domain Code provides that the date of valuation generally should be the earlier of "(1) the date upon which the governmental agency first makes a deposit * * * or (2) the date upon which the trial of the issue of the amount of compensation commences." *Id.* § 12.23[4] at 12–127.

The foregoing makes it abundantly clear that in assessing the date of taking with respect to the instant case, absent a prior physical intrusion by the PPBA upon the Joslin Farm, the date upon which title passed to the PPBA and upon which a taking occurred could be none other than the date upon which title vested in the PPBA. Thus in accordance with the prevailing views, title to the Joslin Farm vested in the PPBA on January 4, 1991, the date the PPBA complied with the requirements set forth in § 45–50–13(a), filed the resolution in the Scituate land evidence records, and deposited $2,637,500, half the amount of the estimated sum of just compensation for the Joslin Farm, with the Superior Court.

As noted previously, plaintiffs assert that the subsequent diminution in the value of the Joslin Farm following the enactment of P.L.1989, ch. 298, on July 7, 1989, necessitates a conclusion that title vested in the PPBA on the date upon which the act was enacted. At the outset it is important to note that it is generally recognized that

"[t]he mere passage of legislation authorizing acquisition of property by eminent domain is ordinarily not sufficient, in and of itself, to constitute a taking. Where, however, the provisions of the statute and the circumstances under which the appropriation is to take place are such as to indicate that the purpose of the law was to effect a taking by virtue of the statute itself, it has been held that a statute may be so construed as to vest title in the condemnor upon mere passage of the law." 2 Nichols, *The Law of Eminent Domain*, § 6.04 at 6–31, 6–32 (1985).

To date this jurisdiction has not previously addressed this question.[1] However, as indicated, a number of jurisdictions, including the Supreme Court, are in accord with the foregoing proposition. Specifically, in *Danforth v. United States*, 308 U.S. at 286, 60 S.Ct. at 237, 84 L.Ed. at 247, the Court stated that "the mere enactment of legislation which authorizes condemnation of property cannot be a taking. Such legislation may be repealed or modified, or appropriations may fail." The Court further stated that "[a] reduction or increase in the value of property may occur by reason of legislation for or the beginning or completion of a project. Such changes in value are incidents of ownership. They cannot be considered a 'taking' in the constitutional sense." *Id.* at 285, 60 S.Ct. at 236, 84 L.Ed. at 246.

Likewise, in *Town of Swampscott v. Remis*, 350 Mass. 523, 526–27, 215 N.E.2d 777, 779 (1966), the Massachusetts Supreme Judicial Court stated:

"The enactment of legislation authorizing the condemnation of property does not constitute a taking, properly defined, which entitles an owner to compensation * * *. Changes in value due to these causes are no more than incidents of ownership in a jurisdiction such as ours where all land is subject to the exercise of the power of eminent domain."

In *Orono–Veazie Water District v. Penobscot County Water Co.*, 348 A.2d 249, 255 (Me.1975), the Maine Supreme Judicial Court held that

"the mere existence of an optional right to take property by eminent domain, which the prospective condemner may discontinue or abandon at any time prior to its ultimate conclusion, is not, in and of itself, a taking, even though it may have an adverse effect on the value of the property. The resulting depreciation ensuing from such an event is an incident

of ownership rather than a 'taking' in the constitutional sense."

With the foregoing conclusions in mind, we are of the opinion that § 45–50–13 did not effectuate a taking upon its enactment. Rather we construe it as conferring discretionary authority upon the PPBA and other like authorities to take certain parcels, including the Joslin Farm, by eminent domain. Indeed § 45–50–13(a) provides in pertinent part:

"[T]he authority shall have the right to acquire any land, or any interest therein, including developmental rights, by the exercise of the power of eminent domain, *whenever it shall be determined by the authority that the acquisition of the land, or interest,* is necessary for the construction or operation of any project.

"(1) The power of eminent domain shall be exercised only within the boundaries of the city or town whose council established the authority, except that any authority in existence on the effective date of this act shall have the power to acquire, by exercise of eminent domain, only the development rights, except as set forth in subsection (5), in the land described in the tax assessor's plats for the town of Foster, *Scituate*, Johnston and Glocester as of February 14, 1989 for the purpose of protecting the water supply as follows:

\* \* \* \* \* \*

"(2) In addition to the powers previously granted, *any authority in existence on the effective date of this act shall have the power to acquire by exercise of eminent domain the land, or any interest therein,* described as that certain land situated in the town of Scituate delineated as Scituate tax assessor's lots 45, 48, 49, 60, 61, 62, and 63, plat 51 consisting of 542.11 acres, more or less,

---

1. Although we have not previously addressed the question of whether the mere enactment of legislation authorizing a taking of specified property constitutes a taking, we have held that when the condemnation of an adjacent parcel results in the depreciation in the value of an owner's parcel—but when the owner's possession, use, or enjoyment has not been impaired—

a constructive taking did not occur. The "[d]iminution in value alone is simply not sufficient to present a cognizable claim for taking of an interest in property under the Fifth and Fourteenth Amendments." *E & J, Inc. v. Redevelopment Agency of Woonsocket*, 122 R.I. 288, 291, 405 A.2d 1187, 1189 (1979).

and *commonly known as the 'Joslin Farm' for the purpose of protecting the water supply."* P.L.1989, ch. 298, § 1. (Emphases added.)

Section 45–50–13(a)(6) provides: "Prior to the authority's taking the actions described in subsections (b) through (h) * * * fair market value of the property or development rights shall be determined as follows." Thereafter § 45–50–13(a)(6) sets forth the method by which appraisers are appointed and appraisals are ascertained. Section 45–50–13(b) provides that

"[t]he necessity for acquisition shall be conclusively presumed upon the adoption by the authority of a resolution declaring that the acquisition of land, or interest therein * * * is necessary for the construction or operation of any project. Within six (6) months thereafter, *the authority shall cause to be filed, in the land evidence records* of the city or town in which the land is located, a copy of the resolution * * * and *a statement * * * that the land, or interest therein, is taken pursuant to the provisions of this chapter."* (Emphasis added.)

Finally, § 45–50–13(c) provides:

"Upon the filing of the copy of the resolution * * * in the land evidence records * * * the filing, in the superior court, of the statement, and the depositing in the superior court * * * of such a sum as the court shall determine to be amply sufficient to satisfy the claims of all persons interested in the land * * * *title to the land, or interest therein, shall vest in the authority in fee simple absolute, and the authority thereupon may take possession of the land, or interest therein."* (Emphasis added.)

Such language is clearly discretionary and was made applicable not only to the PPBA but also to any other authority in existence as of February 14, 1989. Certainly the Joslin Farm could not have been condemned by multiple authorities upon the statute's passage. Nothing contained therein mandates a taking as of the time of the statute's enactment; rather the appropriate authority is merely given the power to condemn certain parcels whenever it

deems it to be necessary. Such a necessity may or may not ever arise. Furthermore, the General Assembly could have repealed or modified § 45–50–13 at any time prior to the date of formal condemnation or the appropriations could have failed, requiring the abandonment of the project. Without doubt a taking was not intended to occur upon the enactment of the statute but rather was to occur only upon the vesting of title that only could have occurred upon the filing of the resolution within the appropriate land evidence records and the depositing of the certain sum with the court.

## II

The PPBA next avers that the trial justice erred by accepting the appraisal provided by O'Reilly. Specifically the PPBA not only claims that O'Reilly's valuation was not based upon legally specific facts but also contends that O'Reilly's plans to use certain parcels for a golf course were based on purely speculative and unsupported assumptions. Indeed, the PPBA claims that O'Reilly's appraisal was flawed by the absence of an analysis for the marketability, business feasibility, cash-flow projection, actual hard-cost analysis, and developmental costs of a golf course.

Conversely the estate contends that the trial justice acted properly in accepting O'Reilly's appraisal completely. The estate claims that O'Reilly's appraisal was based both on experience and on an appropriate comparable-sales analysis, which included an examination of two large vacant tracks situated nearby and the sales of two golf courses. In opposing the PPBA's assertion that O'Reilly's appraisal was flawed because it failed to consider developmental costs, the estate asserts that such costs were not relevant because O'Reilly was not evaluating a completed golf course but rather was merely appraising the undeveloped land.

Although he acknowledged the deficiencies in O'Reilly's appraisal, the trial justice nonetheless accepted his appraisal completely. Specifically, the trial justice stated:

"The court reserved decision in order to afford itself the opportunity to go over various exhibits and also its notes. I have done that. * * *

"The defendant, in its' final argument, indicated that the golf course concept was an interesting idea as was an elephant farm. He noted * * * *however, there was no evidence before the Court as to the actual cost of developing such a concept. Also, there was no evidence as to the projected cash flow. There was no foundation laid for that premise.*

"Mr. O'Reilly testified * * * that the highest and best use of that property was to develop a portion of it for use as a golf course.

"The court has very carefully gone over all of the exhibits introduced during trial. I have gone over the testimony of the expert witnesses and I have concluded and concur completely with the appraisal of Mr. O'Reilly. I feel that the use of this property—the best, highest and best use, would be the thirty-six house lots * * * and the three hundred sixty-five remaining acres used as a golf course and general recreational purposes.

"*I realize that there is no testimony introduced during the trial regarding the actual cost of the making of such a golf course, and there wasn't any evidence of projected cash flow.* However, I am satisfied based upon the testimony of Mr. O'Reilly, based upon his comparative sales, that the remaining three hundred fifty-seven [*sic*] acres at $12,000.00 per acre is fair and reasonable under the circumstances." (Emphases added.)

■ To reiterate, "the findings of a trial justice sitting without a jury are accorded great deference and will not be disturbed unless it is demonstrated that the trial justice misconceived or overlooked material evidence or was otherwise clearly wrong." *Green,* 559 A.2d at 1048. Indeed we accord great weight to findings of the trial justice sitting without a jury. *Warwick Musical Theatre, Inc.,* 525 A.2d at 909 (citing *Cunningham v. Marcello,* 106 R.I. 400, 404, 260 A.2d 451, 453 (1970)).

■ It is well settled that prices paid in the open market at or about the time of the taking for substantially similar and comparable properties, when available and when proper adjustments can be made for minor differences between the properties, are the most persuasive evidence of the fair market value of the property. *J.W.A. Realty, Inc. v. City of Cranston,* 121 R.I. 374, 380, 399 A.2d 479, 482 (1979) (citing *Thomas B. Gray, Inc. v. Providence Redevelopment Agency,* 114 R.I. 370, 373, 333 A.2d 143, 145 (1975); *Manning v. Redevelopment Agency,* 103 R.I. 371, 374, 238 A.2d 378, 380 (1968)); *see also Kirby Forest Industries, Inc. v. United States,* 467 U.S. 1, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984). Furthermore, we have consistently held that although "the comparable-sales method of determining fair-market value is the preferred method of valuation in condemnation proceedings, it is within the discretion of the trial justice to depart from this method when he finds that the subject property is unique or special purpose." *Warwick Musical Theatre, Inc.,* 525 A.2d at 910 (citing *O'Donnell v. State,* 117 R.I. at 665, 370 A.2d at 236); *see also J.W.A. Realty, Inc.,* 121 R.I. at 381, 399 A.2d at 483; *Thomas B. Gray, Inc.,* 114 R.I. at 373, 333 A.2d at 145.

■ In ascertaining the fair-market value of property, one must consider such factors as developmental costs and marketability. Indeed, in *United States v. 158.24 Acres of Land, More or Less,* 696 F.2d 559, 564 (8th Cir.1982), the court held that in establishing fair-market value,

"[a]ccount must be taken of all factors which would be considered by a prospective purchaser, including, inter alia:

(1) Cost of subdivision including loss of land for streets and utility easements, plating and surveying expense, road and street improvements;

(2) Cost of holding the property while it is being subdivided and sold, briskness of demand, etc." *See also French v. Town of Clinton,* 215 Conn. 197, 575 A.2d 686 (1990) (included within the costs of development are expenses associated with acquiring all necessary permits).

 We examine the testimony provided by O'Reilly in light of the foregoing principles and in light of our holding that "an expert's opinion must be predicated upon facts legally sufficient to form a basis for his conclusion." *Alterio v. Biltmore Construction Corp.*, 119 R.I. 307, 312, 377 A.2d 237, 240 (1977) (citing *Nasco, Inc. v. Director of Public Works*, 116 R.I. 712, 360 A.2d 871 (1976); *Dickinson–Tidewater, Inc. v. Supervisor of Assessments*, 273 Md. 245, 329 A.2d 18 (1974)). "[F]acts upon which the opinion of the expert is based must be stated; otherwise, 'it becomes impossible to ascertain whether the conclusion drawn from them possesses sufficient probative force; or is not mere conjecture or speculation.'" 119 R.I. at 313, 377 A.2d at 240 (quoting *Dickinson–Tidewater, Inc.*, 273 Md. at 253, 329 A.2d at 23–24; *see also Uhlik v. Kopec*, 20 Md.App. 216, 314 A.2d 732 (1974)). An expert's opinion about the value of buildings that is based solely on the expert's experience in evaluating property is entitled to no weight in the absence of any specific reasons or factors for arriving at such an opinion. *See Nasco, Inc.*, 116 R.I. at 721, 360 A.2d at 876. "An expert may not give an opinion without describing the foundation on which his opinion rests." *Id.* Indeed in *L'Etoile v. Director of Public Works*, 89 R.I. 394, 153 A.2d 173 (1959), this court affirmed the trial justice's exclusion of an expert's opinion concerning the fair-market value of property that was based on his experience in real estate. This court reasoned, "To assist him in conducting an intelligent cross-examination, respondent was entitled to know the reasons or factors on which the witness relied to support his opinion." *Id.* at 402, 153 A.2d at 178.

 As stated previously, O'Reilly's appraisal consisted of a comparable-sales analysis of similarly situated tracts of land and golf courses. However, with respect to the approximately 375 acres allotted for a golfing facility, O'Reilly's appraisal lacked the necessary consideration of developmental costs, business marketability, and feasibility analysis and a cash-flow projection from such a project. Further, despite an acute awareness of the absence of these factors, the trial justice erroneously accepted O'Reilly's appraisal completely. Indeed, the trial justice was clearly wrong in doing so as the appraisal was purely speculative and had been based upon mere conjecture.

Accordingly the defendant's appeal is sustained. The judgment of the Superior Court is reversed. The case is remanded to the Superior Court for a new evidentiary hearing.