[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
This appeal arises out of a March 7, 2003 decision of the Newport Zoning Board ("Board" or "Zoning Board") granting a dimensional variance for relief from the side line setback and lot coverage requirements of the Newport Zoning Ordinance ("Ordinance") to Accrington Realty, Inc. ("Applicant"), Review is pursuant to G.L. 1956 § 45-24-69.
The lot in question is zoned as part of a R-10 residential district. The ordinance requires a minimum of area of 10,000 square feet. See
CODIFIED ORDINANCES OF THE CITY OF NEWPORT, RHODE ISLAND, tit. 17, § 17.20.030 (1994). The lot here, however, has only 3,758 square feet. The Ordinance also requires that buildings comprise no more than 20% of the lot. Id. § 17.20.050. The minimum setback requirements are 15 feet front yard, 10 feet from the sidelines, and 20 feet from the rear line. Id. § 17.24.040.
The request for the variance was preceded by a grant of the City of Newport Planning Board ("Planning Board") which gave the Applicant permission to demolish an existing home on the property. The Planning Board conditioned the demolition permit upon (1) that the current structure is replaced with a single-family residence; (2) construction of the new structure commence within 6 months of demolition of the current structure; (3) the plans for a new structure consider the scale of the existing neighborhood; and (4) environmental issues, such as lead paint and asbestos, are addressed prior to demolition.
After obtaining approval from the Planning Board for the demolition, the Applicant proposed a new structure for the property. The size and shape of the proposed structure would require variances, however. Accordingly, the Applicant filed for relief with the Zoning Board and a hearing was duly held on January 27, 2003.
At the hearing, the Zoning Board heard evidence about both the existing structure and the proposed new home. The location of the existing structure, vis-à-vis the existing lot lines, is not established by the record with any accuracy. Richard Johnston ("Johnson"), Applicant's Managing Partner, testified that the home was "about five feet or one or two feet off the front property line." (Tr. at 11.) A Property Line Survey prepared for the Applicant suggests that the front setback was one foot or less, and that this included a closed in porch which, apparently because it has no foundation, is not included within the 31 foot measurement of the home. (Record, Ex. 16.)[1] Johnston also testified that the structure was set two feet off of the north, side lot line. (Tr. at 11.) However, a staff report to the Zoning Board indicates that it was only a one-foot setback. (Record, Ex. 15.) Thus, all that can be gleaned from the record is that there existed on the property, at the time of the hearing, a 31' × 17" home, with a porch adding to the 31 foot measure, located approximately one to two feet from the north side, and one to two feet from the front. (Record, Ex. 16.) The south side thus exceeded the Ordinance's minimum setback requirements by approximately nine feet, and the rear setback exceeded by approximately 40-45 feet. The entire house took up only 17% of the lot's 3,785 square foot area. (Record, Ex. 13.) Thus, there were only two setback nonconformances, the structure deviating by approximately 14 and 9 feet from the front and north, side setback requirements, respectively.
Johnston also testified about the condition of the existing structure. He testified that it is "beyond repair," and that "[t]he town had ordered it to be boarded up when we purchased the property." (Tr. at 7.) He further testified that "[t]here's nothing in there that works, and there is no way that you could possibly rebuild that structure in it's [sic] present condition," (Tr. at 8), and that "there is no way you could renovate that house at all. It's beyond repair, but 50 percent would be an absolute no brainer." (Tr. at 16.) He testified that, given such extensive repairs, "you need to get a flood elevation of 12 in order to keep insurance and meet the current codes, which have to be above that. Another reason we couldn't remodel the building, you couldn't get everything above elevation 12."[2] (Tr. at 15.)
The Applicant also presented the testimony of Warren Ducharme ("Ducharme"), a registered architect with two years of experience as a Town Planner for Foster, Rhode Island, from 1998-2000. (Record, Ex. 5, (Resume, Warren J. Ducharme, Architect)). Ducharme testified that the condition of the present structure was inadequate to support a renovation that would comply with FEMA and the State Building Code. (Tr. at 21-23.)
Thus, Applicant sought to demolish the dilapidated structure and to build a new structure on the property. In designing the new house, Johnson testified, one goal was to provide on-site parking. (Tr. at 12.) This was accomplished by placing the house "centrally" on the lot, increasing the front yard setback to approximately 25 feet and eliminating the existing nonconformance. (Record, Ex. 15, (Survey of Plat 39, Lot 289.))[3] Further, the north sideyard nonconformance was decreased by increasing that setback from one (or two) to four feet. However, because the design called for a 24 foot width — an increase of seven feet from the previous residence — the south-side setback was reduced to eight feet, requiring a two foot variance. Though the proposed home was enlarged to 40 feet, as opposed to the previous 31 foot residence, the new location eliminated the need for a variance from the mandatory front or rear lot line setbacks. However, because Ordinance § 17.20.050 limits the area of the lot to be covered by a structure in an R-10 zoning district to 20%, a third variance was required. Thus, the new home would deviate from the 10 foot side line setback requirements by six and two feet on the north and south side lot lines, respectively, and would also require an area variance.[4]
After the January 27, 2003 hearing, the Zoning Board granted the requested variance from the side line and lot coverage requirements. Plaintiffs George and Irene Wall ("Plaintiffs"), who contested the application at the hearing, timely appealed. Plaintiffs share the south lot line with the Applicant. It is clear from the record that Plaintiffs' primary concern was and is with the request for the side line variances, and in particular, the south side variance. Plaintiffs observed that a sizeable structure could be built that would reduce "the North setback nonconformance, meet the South and West setback, eliminate the front setback nonconformance (applicant's option). . . ." However, they suggested that such a structure, "consistent with the existing neighborhood," would not be as "elegant, costly . . . expensive" and "profitable" as Applicant desired. See Letter from George and Irene Wall to Office of Zoning and Planning, Newport, R.I. of 11/20/02 at 4); Letter from George and Irene Wall to Office of Zoning and Planning, Newport, R.I. of 11/20/02 at 4.)
 Standard of Review
Rhode Island General Laws 1956 § 45-24-69 vests the Superior Court with jurisdiction to review a zoning board's grant of an application for a variance. Section 45-24-69(d) provides:
 "The Court shall not substitute its judgment for that of the zoning board of review as to the weight of the evidence on questions of fact. The court may affirm the decision of the zoning board of review or remand the case for further proceedings, or may reverse or modify the decision if substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions, or decisions which are:
 (1) In violation of constitutional, statutory, or ordinance provisions;
 (2) In excess of the authority granted to the zoning board of review by statue or ordinance;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
"Substantial evidence . . . means such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means [an] amount more than a scintilla but less than a preponderance."Lischio v. Zoning Bd. of Review of the Town of North Kingstown,818 A.2d 685, 690, n. 5 (R.I. 2003) (quoting Caswell v. George ShermanSand Gravel Co., 424 A.2d 646, 647 (R.I. 1981).
 Analysis
A. Spplicant May Seek a Variance After Abandoning a Legally Nonconforming Structure Because of its Dilapidated Condition
Plaintiffs argue that the Applicant may not seek a variance to construct a new home because the current residence exists as a legal nonconformance. Plaintiffs contend, therefore, that the Applicant must confine any development to the footprint of that building, or, alternatively, to develop a new home that adheres to the requirements of the Ordinance. For this proposition, Plaintiffs rely upon Ordinance §§ 17.72.020B. and C., which provide, in relevant part, that:
 ". . . No nonconforming building shall be moved, unless the result of such moving is to reduce or eliminate its nonconformity.
 C. No . . . nonconforming structure shall be changed except to a conforming . . . structure. No nonconforming structure, if once changed to conform, shall thereafter be changed so as to be nonconforming again."
Newport's Ordinance thus promotes the principle that nonconforming uses or structures should be accorded only limited tolerance, and "discourages the re-establishment of nonconforming uses, the investment value of which has been lost to the owner through accident and through no action on the part of the municipality." 4 Arden Rathkopf and Daren Rathkopf, The Law ofZoning and Planning § 51.08[6] at 151-152 (4th ed. 1998).
The question presented by the facts of this case, and by its posture before this Court, is whether a zoning board has the authority to grant to an owner the same variance it would grant otherwise, but for the fact that the owner has voluntary demolished a dilapidated structure that was already dimensionally nonconforming. Plaintiffs argue that abandonment of a nonconforming structure, coupled with a new variance, amounts to a defacto movement and change of the structure in violation of these Ordinance provisions. Applicant disagrees, arguing that once a legal nonconforming use is abandoned because it is no longer feasible to continue its use, the landowner has equal rights to a new variance as would the owner of an undeveloped parcel. The controversy is resolved with reference to the policies underlying the law of legal nonconformances.
It is a well-accepted notion that "if . . . improvements [to a nonconforming property] are destroyed or abandoned, [the owner] has lost the value of his investment independently of the ordinance and there is no reason why his relationship to the zoning ordinance should be anydifferent from that of his neighbor whose property was unimproved." Id.
at 151-152 (quoting Service Oil Co. v. Rhodus, 179 Colo. 335,500 P.2d 807, 813-814 (1972)) (emphasis added). Thus, the object of laws against changing or moving legally nonconforming structures is to promote their eventual abandonment, so that the extraordinary rights enjoyed by their existence will be eliminated thereby. Where a variance would be proper given the absence of the preexisting nonconformance and the nonconformance is to be wholly demolished, to deny the applicant the right to relief would be a tortured reading of the Ordinance.
The provision of the Newport Ordinance relied upon by Plaintiffs must be interpreted with common law policies in mind — policies which serve as the background of every piece of legislation on the law of legal nonconformances.[5] By prohibiting owners of nonconforming development from altering or expanding the nonconformance, Newport's Ordinance codifies the common law rule, explained above, that such development be eliminated by way of obsolescence.[6] It does not, however, provide that an owner of a nonconforming development loses the right to a dimensional variance that would otherwise be afforded if the lot were unimproved. Therefore, the Applicant's proposal to demolish the existing nonconformance and to seek a variance to erect a new structure is procedurally proper and not prohibited by the Ordinance.[7]
B. Applicant Failed to Present Reliable, Probative, and Substantial Evidence Board to Support Its Request for Zoning Relief
The conditions precedent to a grant of a dimensional variance can be found in G.L. 1956 § 45-24-41, which provides in pertinent part, that,
 "(c) In granting a variance, the zoning board of review requires that evidence to the satisfaction of the following standards is entered into the record of the proceedings:
 (1) That the hardship from which the applicant seeks relief is due to the unique characteristics of the subject land or structure and not to the general characteristics of the surrounding area; and is not due to a physical or economic disability of the applicant, excepting those physical disabilities addressed in § 45-24-30(16);
 (2) That the hardship is not the result of any prior action of the applicant and does not result primarily from the desire of the applicant to realize greater financial gain;
 (3) That the granting of the requested variance will not alter the general character of the surrounding area or impair the intent or purpose of the zoning ordinance or the comprehensive plan upon which the ordinance is based; and
 (4) That the relief to be granted is the least relief necessary."
Additionally, § 45-24-41(d) requires the satisfaction of the following condition before a dimensional variance may be granted:
 "The zoning board of review shall, in addition to the above standards, require that evidence is entered into the record of the proceedings showing that . . . the hardship suffered by the owner of the subject property if the dimensional variance is not granted amounts to more than a mere inconvenience. The fact that a use may be more profitable or that a structure may be more valuable after the relief is granted is not grounds for relief. . . ."
This section was amended in 2002 to eliminate the definition of "mere inconvenience" as meaning "that there is no other reasonable alternative to enjoy a legally permitted beneficial use of one's property." See P.L. 2002, ch. 384, § 1.[8]
Our Supreme Court has interpreted the 2002 amendment as reinstating the judicially created Viti Doctrine. Lischio, 818 A.2d at 691. See Viti v.Zoning Bd. of Review of Prov., 92 R.I. 59, 64-65, 166 A.2d 211, 213 (1960).[9] A property owner, therefore, is no longer required to demonstrate that she "can [not] enjoy a legally permitted beneficial use of the property without the proposed variance." Sciacca v. Caruso,769 A.2d 578, 583, n. 6 (R.I. 2001). However, the Applicant must nonetheless prove that the requested relief is the least relief necessary. See G.L. § 45-24-41(c)(4); Lischio, 818 A.2d at 692 ("in order for a request for a dimensional variance to be granted the applicant must satisfy the requirements for both § 45-24-41(c) and (d)(2)"). It is clear that the Legislature in retaining this requirement — while deleting an applicant's burden of proving no reasonable, permitted alternative that would conform to the ordinance — intended to ensure that variances not be given out haphazardly.
A landowner who can prove the requisite hardship is not given a "blank check" enabling him or her to prescribe the amount of relief to be approved so long as that relief does not alter the character of the neighborhood. Section 45-24-41(c)(3). Rather, upon proof that full conformance to a zoning ordinance's dimensional requirements would impose upon the applying landowner a hardship amounting to more than a mere inconvenience, § 45-24-41(d)(2), a zoning board is required to do more than approve, without further inquiry, the proposed development plans. The Board's duty is to inquire into the extent of relief necessary, and to grant only that relief, § 45-24-41(c)(4), if to do so comports with §§45-24-41(c)(1)(2) and (3). As our Supreme Court once said, applyingViti,
 "applications for relief from lot-line regulations are addressed to the sound discretion of boards of review whose authority to act favorably is limited to the extent of relief demonstrated to be reasonably necessary to the enjoyment of the permitted use sought to be served. Absent such demonstration, a decision relieving land of building, lot-line and height restrictions is arbitrary and constitutes an abuse of discretion." Lincoln Plastic Prods. 104 R.I. at 115, 242 A.2d at 303.
Thus, though the Applicant here need not demonstrate the lack of a permitted use that could be built without a dimensional variance, it must demonstrate that the relief requested for this 3 bed, 2½ bath home — replete with two dining areas and a full sized kitchen — is the least necessary to accommodate a minimally reasonable single-family dwelling.[10] Section 45-24-41(c)(4).
Though Applicant presented a licensed real estate agent, interestingly, the agent was not called to testify to the marketability of the proposed home or to the complete unmarketability of a different or smaller home. He testified only to the general nature of homes in the neighborhood, such as average width and lot coverage percentage. Although this testimony was sufficient to carry Applicant's burden of proving that "the granting of the variance will not alter the general character of the surrounding area," G.L. § 45-24-41(c)(3), it does not demonstrate that the requested relief is necessary for the enjoyment of a single-family dwelling. The only possibly relevant testimony offered by Chapman was that an 18 foot wide home would not be a reasonable one because "it would be more like an RV or perhaps a mobile home." (Tr. at 28.) However, he did not suggest that a home of this width, or one any less than 24 feet, would be unmarketable or unlivable. And no other evidence was presented to make up for this glaring gap in what might have otherwise been probative testimony on the issue; Applicant presented no evidence whatsoever that a home less than 24 feet wide, or one requiring less of an area variance than this proposal, would be objectively unreasonable, e.g., evidence that it would be unmarketable and uninhabitable.
Moreover, none of the witnesses provided probative testimony that the requested relief was necessary under architectural/engineering constraints. When asked whether a reasonable home could be built in a "smaller size to prevent the two variances requested," Mr. Johnston, Applicant's Managing Partner, merely replied "no," explaining that "you have to make space for [utilities],[11] and also the width of the house, it's a 24-foot-wide house, and that is the minimum width to be able to get a set of stairs in the house and get bedrooms, and if you note the bedrooms in the house, they're not big."[12] (Tr. at 12) (emphasis added). He later testified that 24 feet was "the minimum width to be able to design a house that, when you put the stairs up the middleof the house, that you have some room left over to have reasonably sized rooms." (Tr. at 63) (emphasis added). Thus, the width of the home was a function, at least in part, of the submitted design. However, Johnson did not state that a different design would not be feasible, which would decrease the width or area of the home, incorporate the utility room, and provide reasonable living space — even if that meant less space than proposed[13] and/or moving the staircase from the middle of the home.[14] Thus, Johnson provided no testimony probative of the question whether the proposal requested the least relief necessary to reasonably enjoy the permitted use of the lot as a single-family dwelling.
Further, Applicant's architect, Ducharme, when asked whether a smaller home would be reasonable, replied in the negative, stating that "the room sizes are to permit comfortable use of the property," and to "get access from one floor to the other, the minimum width of the corridors, occupied areas to be above the flood plain requires that size building." (Tr. at 23.)[15] Thus, though he concluded that a home had to be the size of the one he designed, Ducharme did not state that a home with as much area could not be designed to fit within the side line setback requirements or that a 24 foot width — as opposed to anything less — was necessary to accommodate corridors and stairs under any objectively reasonable design more conforming to the Ordinance's setback requirements.
Finally, to the extent that Applicant's witnesses opined that a smaller home would not be reasonable or, for example, that the proposed bedrooms were minimal in size, they failed to disclose any reasons for that conclusion. "[F]acts upon which the opinion of [an] expert is based must be stated; otherwise, `it becomes impossible to ascertain whether the conclusion drawn from them possesses sufficient probative force; or is not mere conjecture or speculation.'" Ferland Corp. v. Bouchard,626 A.2d 210, 214 (R.I. 1996) (quoting Gorham v. Public BuildingAuthority of Providence, 612 A.2d 708, 717 (R.I. 1992)). For example, Ducharme concluded that no smaller home would be reasonable, apparently because he believed that this home was "modest in size. It's compact." (Tr. at 22.) However, he offered no factual basis[16] for his (implicit) conclusion that a minimally reasonable home requires three "comfortable" bedrooms, two and one half bathrooms, or two dining areas.[17] "If the expert fails specifically to set forth the factual basis for his conclusion, the [Board] must disregard his testimony." Id.
(citing Burrillville Racing Ass'n v. Tellier, 574 A.2d 749, 752 (R.I. 1990). Cf. Richardson v. Zoning Bd. of Review, 101 R.I. 194,221 A.2d 460 (1966) (abutting property owner's bare assertion that proposed use would depreciate her property was lay judgment unsupported by any factual data and was not competent evidence that would warrant denial of special exception); Morgan v. Washington Trust Co., 105 R.I. 13, 17,249 A.2d 48, 51 (1969) ("all matters of [non-expert] opinion are excluded from evidence as being unreliable"). A witness's naked, subjective conclusion that a smaller home would not be objectively reasonable is not reliable or probative evidence on the issue.
In conclusion, even granting credit to the Zoning Board's conclusion that full conformance to the zoning ordinance's dimensional requirements, (which would allow a home 17' by 44' feet, having a two-floor area of 1496 square feet), would result in more than a mere inconvenience, Applicant offered no competent and probative evidence that a home smaller than this 3 bedroom, 2½ bath structure, with an interior area of 1832 square feet, would not be sufficient to permit reasonable enjoyment of the permitted use, i.e. a single-family dwelling. Applicant offered no probative evidence that, due to architectural/engineering constraints, a smaller home would still require a 24' width. Nor did Applicant argue that a home designed to be in greater conformance with the Ordinance's requirements would be completely unmarketable. Absent evidence that a more conforming home could not be designed to eliminate the asserted hardship, Applicant could not demonstrate that the proposal requested the least relief necessary, as required by G.L. § 45-24-41(c)(4). And though the Board may very well have premised its grant of relief on its members' knowledge of the neighborhood, reasonable living needs, and/or market constraints, their reasons were not disclosed on the record, and, therefore, cannot sustain the decision. See Toohey v.Kilday, 415 A.2d 732, 737-38 (R.I. 1980).
C. The Board Failed to Make the Required Findings of Fact and Conclusions of Law in Support of its Decision
With respect to the Zoning Board's written decision, the Board failed to provide adequate findings of fact for judicial review. It is well settled that "a zoning board of review is required to make findings of fact and conclusions of law in support of its decisions in order that such decisions may be susceptible of judicial review." Thorpe v. ZoningBoard of Review of North Kingstown, 492 A.2d 1236, 1236-37 (R.I. 1985). Judicial review of a board's decision is impossible, unless the board has made factual determinations and applied appropriate legal principles in such a way that a judicial body might reasonably discern the manner in which the board has resolved evidentiary conflicts. May-Day Realty Corp.v. Board of Appeals of Pawtucket, 107 R.I. 235, 239, 267 A.2d 400, 403 (1970).
Although the Board concluded that denial of a dimensional variance would result "in more than a mere inconvenience," (Decision, finding #14), it provided no findings of fact to support this decision and left this Court to search the record for the basis of its decision. Even assuming that full conformance would result in the requisite burden,[18] the Board likewise made no findings of fact to support the conclusion that all of Applicant's requested variances were necessary to enjoy the permitted use of a single-family dwelling. Rather, the Board stated only that the "design and layout of the structure permits the reasonable living area for a single family dwelling." (Decision, Finding # 6). Notably, the Board did not make a finding that the design and layout permitted the minimum reasonable living area for a single-family dwelling or that no reasonable alternative design could be made that would require less zoning relief. And, the Board's conclusion that "the petition does request the minimum variance that would make reasonable use of the land," (Decision, Finding # 8), is unexplained — the Board's "findings must be factual rather than conclusional, and the application of the legal principles must be something more than the recital of a litany." Sciacca v. Caruso, 769 A.2d 578, 585 (R.I. 2001) (quoting IrishPartnership v. Rommel, 518 A.2d 356, 358 (R.I. 1986)).
Where a zoning board fails to state findings of fact, the court should not search the record for supporting evidence or decide for itself what is proper in the circumstances. Irish Partnership v. Rommel,818 A.2d 356 (R.I. 1986). However, though the reviewing court may "remand the case for further proceedings, or may reverse or modify the decision if substantial rights of the appellant have been prejudiced . . .," G.L. § 45-24-69, a remand for further proceedings "should not be exercised in such circumstances as to allow [parties] another opportunity to present a case when the evidence presented initially is inadequate." Roger WilliamsCollege v. Gallison, 572 A.2d 61, 62 (R.I. 1990). Rather, the remand "should be based upon a genuine defect in the proceedings in the first instance, which defect was not the fault of the parties seeking remand, or upon the fact that no record of the proceedings upon which a reviewing court may act" has been certified to the court. Id. (cites omitted).
Here, the Zoning Board's lack of findings contained in its written decision is clearly a reflection of the lack of evidence and only vague and unexplained conclusions of Applicant's witnesses. None of the witnesses presented probative evidence that the home as designed provided the minimum area necessary for a habitable home, that a home of this size or smaller could not be designed that would require less deviation from the Ordinance requirements, or that the width and area of the home designed was the least relief necessary due to market factors. SeeWestminster Corp., 103 R.I. at 388, 238 A.2d at 358 (upholding grant of variance necessary for "any assurance of financial success," and for an "economically sound building project") (emphases added).
 Conclusion
The Board's written decision, because it lacks specific findings of fact, is not susceptible to adequate judicial review. However, the Board's failure to render the requisite findings to support its decision should not provide the applicant with a second chance to present the evidence required to prove entitlement to a dimensional variance that it should have presented in the first instance. It is clear that Accrington Realty, Inc. had a full and fair opportunity to present evidence to the Board to support its request for zoning relief and failed to do so. Thus, this Court finds that a remand for the purpose of allowing the Board to make findings of fact and conclusions of law would be futile on the state of the record and that a remand for the taking of more evidence would be, here, "inappropriate." Roger Williams College, 572 A.2d at 62. Therefore, after a review of the entire record, this Court finds that the decision of the Board is arbitrary and capricious, clearly erroneous in view of the reliable, probative and substantial evidence of the record, and affected by error of law. G.L. § 45-24-69(d). Accordingly, the decision of the Board is reversed. Counsel shall present an appropriate order for entry.
[1] All references to exhibits are as numbered in the certified record to this Court, and not necessarily as presented to the Board.
[2] Gleaned from the transcript, Applicant's primary concern was that the necessary renovations would exceed 50 percent of the value of the home, and that this would require that it be rebuilt to meet the required above-sea-level height for the applicable flood zone. Otherwise, Applicant was concerned that the home would not qualify for federally subsidized flood insurance. In order to qualify for such insurance, a property owner must comply with certain requirements of the National Flood Insurance Program (NFIP), which is part of FEMA (Federal Emergency Management Act). See generally, Kenneth Young, 3 Anderson's American Lawof Zoning § 18.02[2][b][i] (4th ed. 1996). Whether Applicant's witnesses were correct was, and is, uncontested; however, the Act does exempt improvements done to meet the minimum health, safety, or sanitary codes. Id. at § 18.02[2][c][i] (citing 44 C.F.R. § 59.1). Nonetheless, the Board was presented with sufficient evidence that the home had become dilapidated, that this condition was not created by the prior action of Accrington Realty, Inc., and because of the condition, Applicant wished to abandon the use of the structure. See infra., § A.
[3] Johnson testified that placing the parking in the front, and not the side, of the house was motivated in part by the desire to locate vehicles as far as possible from neighboring properties. (Tr. at 12.)
[4] See Ordinance § 17.20.050 (1994) ("portion of a lot to be covered by buildings shall not exceed twenty (20) percent."); § 17.20.040 ("minimum setback requirements are: A. Front line, fifteen (15) feet; B. Side line, ten (10) feet; C. Rear line, twenty (20) feet").
[5] "In matters of statutory interpretation our ultimate goal is to give effect to the purpose of the act as intended by the Legislature."Webster v. Perotta, 774 A.2d 68, 75 (R.I. 2001) (citing Matter ofFalstaff Brewing Corp. Re: Narragansett Brewery Fire, 637 A.2d 1047, 1050 (R.I. 1994)). "Moreover, when confronted with an unclear or ambiguous statute, there is room for statutory construction and we examine the statute in its entirety in order to `glean the intent and purpose of the Legislature.'" RIH Med. Found., Inc. v. Nolan, 723 A.2d 1123, 1126 (R.I. 1999) (quoting In re Advisory to the Governor, 668 A.2d 1246, 1248 (R.I. 1996).
[6] This codification has added significance in light of the Enabling Act's invitation for municipalities to allow alterations to nonconforming development. The R.I. Zoning Enabling Act § 45-24-40 bestows upon towns the power to authorize the alteration of nonconforming developments. The section provides, in pertinent part:
 "(a) A zoning ordinance may permit a nonconforming development to be altered under either of the following conditions:
 (1) The ordinance may establish a special-use permit, authorizing the alteration, which must be approved by the zoning board of review following the procedure established in this chapter and in the zoning ordinance; or
 (2) The ordinance may allow the addition and enlargement, expansion, intensification, or change in use, of nonconforming development either by permit or by right and may distinguish between the foregoing actions by zoning districts."
Thus, a municipality may establish, in its ordinance, a special-use permit process to permit alterations to nonconforming development. Section45-24-40(1). Or, it may provide for the "enlargement, expansion, intensification, or change in use, of nonconforming development" by permit or by right in designated zoning districts. Section 45-24-40(2).
[7] Though the Applicant has found a valid means to escape the confines of a pre-existing, legal nonconformance, the zoning board is entitled, and, in fact, ought to consider the dimensions of the previous residence when determining whether the requested variances are appropriate under applicable law. The fact that the previous home was smaller, for example, may be taken into account in determining whether the proposed relief is the least relief necessary to enjoy the permitted use sought. Seeinfra.
[8] At the time of the hearing, Newport's Ordinance had not been amended in accordance with the Lischio decision. Rather, it provided that:
 "5. In granting a variance, the zoning board of review shall require that evidence of the following standards be entered into the record of the proceedings:
 a. That the reasons set forth in the application justify the granting of the variance and that the variance, if granted, is the minimum variance that will make possible the reasonable use of the land, building or structure;
 b. That the variance will not be injurious to the neighborhood or otherwise impair the intent or purpose of the zoning code or the comprehensive plan upon which this zoning code is based;
 c. That the hardship from which the applicant seeks relief is due to the unique characteristics of the subject land or structure and not the general characteristics of the surrounding area; and is not due to a physical or economic disability of the applicant; and
 d. That the hardship is not the result of any prior action of the applicant and does not result primarily from the desire of the applicant to realize greater financial gain. . . . [and]
 In granting a dimensional variance, that the hardship that will be suffered by the owner of the subject property if the dimensional variance is not granted shall amount to more than a mere inconvenience, which shall mean that there is no other reasonable alternative to enjoy a legally permitted beneficial use of one's property. The fact that a use may be more profitable or that a structure may be more valuable after the relief is granted shall not be grounds for relief." Ordinance §§ 17.108.010.B.5, and 17.108.010.B.6. (Emphases added).
[9] "Under the Viti rule . . . a landowner, precluded from the full enjoyment of the use of his property for permitted purposes by an insistence upon a literal enforcement of area restrictions, is entitled to relief upon a showing that the adverse effect of such enforcement will amount to something more than a mere inconvenience." Sun Oil Co. v. Zoning Bd. of Review ofthe City of Warwick, 105 R.I. 231, 233, 251 A.2d 167, 169 (R.I. 1969). "The question is whether . . . fullcompliance with the setback provisions of the ordinance would constitute more than a mere inconvenience adversely affecting full enjoyment of the permitted use." Westminster Corp. v. Zoning Bd. of Review of theCity of Prov., 103 R.I. 381, 388, 238 A.2d 353, 357 (R.I. 1968) (emphasis added). See also Rhode IslandHosp. Trust Nat'l Bank v. East Providence Zoning Bd.,444 A.2d 862, 864 (R.I. 1982) (the granting of a variance is proper only upon a showing that literal adherence to the relevant zoning ordinances would result in unnecessary hardship. . . .") (citing DeStefano v.Zoning Board of Review of Warwick, 122 R.I. 241, 246,405 A.2d 1167, 1170; Westminster Corp., 103 R.I. at 386,238 A.2d at 356; Denton v. Zoning Board of Review ofWarwick, 86 R.I. 219, 222-23, 133 A.2d 718, 720 (1957)). If so, the applicant is entitled to a variance, the extent of which is determined by necessity. Lincoln Plastic Prods. v. Zoning Bd. ofReview of the Town of Lincoln, 104 R.I. 111, 115,242 A.2d 301, 303 (R.I. 1968); Section 45-24-41(c)(4).
[10] A "single-family dwelling means a building containing one dwelling unit," Ordinance § 17.08.010. A "dwelling unit" is merely "a structure or portion thereof occupied by a family providing [sic] complete, independent living facilities for one or more persons,
including permanent provisions for living, sleeping, eating, cooking, and sanitation, and containing a separate means of ingress and egress." Id. (emphasis added).
[11] According to the witness, a new home on this lot would have to be built at 12 feet above sea level, with all utilities above ground, as mandated by FEMA. Thus, the first floor of any proposed home would have to provide space for utilities. From the plans submitted for this home, it appears that a 6' × 8' room is sufficient.
[12] The plan of the home's interior depicts a two-floor residence. The first floor is equipped with a kitchen, dining room, and a room labeled "Breakfast/Family." This latter room is of approximately the same size as the dining room. The first floor also has a small utility room, and a half-bathroom. The living room, dining room, and kitchen adjoin each other. Together with the hallway connecting each, these rooms appear to take up slightly less than 15 feet of the home's width. The remaining rooms comprise the rest of the width. Notably, the first floor also has a porch, measuring 11'-10" × 4'.
The second floor of the home contains three bedrooms. Two of the bedrooms measure 12'-2" in width, and approximately 10' in length. The master bedroom, however, is approximately 15' in width and slightly larger than 10' in length. The two smaller bedrooms contain generous closet space. Causing the home to exceed 18', the second floor also contains a master bath, and large walk-in closet — both entered via the master bedroom, — a laundry room, storage closet, and a main bathroom.
The entire home, excluding that portion of the porch within the footprint, has an area of 1832 square feet. Given the planned "central" location on the property, the front and rear setbacks would exceed that required by the ordinance by ten and fifteen feet, respectively. However, the north and south sides would be in nonconformance by six and two feet respectively.
[13] It is true that Johnson testified that the rooms were reasonably sized. However, he failed to provide any basis for these assertions and did not explain why rooms of a different size or configuration were not equally as reasonable. Thus, his testimony is neither reliable nor probative. See infra.
[14] No evidence was presented that a different design requiring less than 24' width, combined, perhaps, with an extended length, could not result in a reasonable home which would be in greater conformity with the sideline and/or area requirements and be consistent with the surrounding neighborhood. For example, the entire area of the planned home is 1920 square feet; however, because a 44 square foot front porch is included within the footprint, the interior of the home has only 1832 square feet. Interestingly, if the home were reduced to a 17' width, fully extended to eliminate the 15' of excess rear lot line setback, and the area of the proposed porch enclosed and added to both floors, the resulting interior area would be 1870 square feet. This 17' × 55' home would have a length only slightly more than three times its width, would have a greater interior area (perhaps useful to accommodate design constraints, such as stair placement), and would decrease the lot coverage variance needed.
[15] Presumably, the reference to the flood plain level was intended to suggest that the utilities, normally located in a basement, would have to occupy some space on the first floor. Notably, Ducharme's design accomplished this, and provided for 3 bedrooms, 2½ baths, and extensive living space.
[16] For example, applicable state or federal housing regulations or the local housing market.
[17] Conversely, Plaintiffs argued that a smaller home would be a reasonable one. (Though George Wall testified as a lay witness, there is no evidence in the record that any of Applicant's witnesses were qualified as experts on what constitutes minimally reasonable living space, or that the answer is not within the knowledge of laymen. See Boccasile v. Cajun Music Limited,694 A.2d 686, 690 (R.I. 1997) (expert testimony is required to establish any matter that is not obvious to a lay person and thus lies beyond common knowledge). In support thereof, George Wall testified that a number of homes in the community had as little floor space as a 39' x 18' home. And, as to marketability of such a home in the area, he testified that he himself had purchased a similarly sized home within the previous two years, with plans to live there permanently upon his retirement. In fact, the neighborhood analysis prepared by Mr. Chapman indicates that the Wall's two-floor home has an area of 1740 square feet. Although this is larger than a 39' x 18' home, it is smaller than one which applicant could build in conformance with the setback requirements. See supra., n. 11. Moreover, the neighborhood analysis suggests that many of the homes in the neighborhood have areas less than 1870 square feet, assuming that they all have at least two floors. See
Record, Ex. #19; Tr. 73 (testimony of Arthur Chapman that homes in the neighborhood are "approximately between 1200 and 1800 feet).
[18] Requiring full conformance with the lot coverage and setback requirements would permit Applicant to build a structure approximately 18' x 42' or 17' x 44' in dimension. (The lot's shape is rectangular, with tone side slightly larger than the opposing side. (See Record Ex. 16)).